Kathy **LANGNER** and Marlin **Langner, Appellants,**

v.

Floyd **SIMPSON** and Spencer Municipal **Hospital, Appellees,**

Brian Nedoba, Northwest Iowa Mental **Health Center, Defendants.**

No. 93–1364.

Supreme Court of Iowa.

May 24, 1995.

As Amended June 22, 1995.

Roxanne Barton Conlin of the Roxanne Barton Conlin Law Firm, P.C., Des Moines, for appellant.

Marvin F. Heidman of Eidsmoe, Heidman, Redmond, Fredregill, Patterson & Schatz, Sioux City, for appellee Floyd Simpson.

Michael W. Ellwanger of Rawlings, Nieland, Probasco, Killinger, Ellwanger, Jacobs & Mohrhauser, Sioux City, for appellee Spencer Municipal Hospital.

Considered by LARSON, P.J., and LAVORATO, NEUMAN, SNELL, and TERNUS, JJ.

LAVORATO, Justice.

Kathy Eileen Langner and her husband Marlin Ralph Langner appeal from an adverse summary judgment ruling dismissing all claims against two defendants in the Langners' medical malpractice case against psychiatrist Floyd Simpson, Spencer Municipal Hospital, counselor Brian Neboda, and Northwest Iowa Mental Health Center.

In the petition, Kathy alleged numerous claims arising out of care each provided her during the 1980s. Marlin's claim is for loss of consortium based on each of Kathy's claims.

Simpson and the hospital moved for summary judgment on all claims against them. The district court granted their motions over the Langners' resistance. The court rested its conclusion on twin findings that (1) all of the Langners' claims against Simpson and the hospital were filed outside of the applicable statutes of limitation time bars, and (2) none of the three grounds the Langners posited for tolling the statutes of limitation applied to any of the Langners' claims against Simpson and the hospital.

On appeal, the Langners assert—as they did in the district court—that their claims against Simpson and the hospital are timely for the following reasons. First, despite reasonable diligence, the Langners were unable to discover their injuries until late 1990 or early 1991, making their petition timely. Second, three different grounds for tolling the applicable statutes of limitation exist in this case: (a) Simpson and the hospital were

negligent in treating Kathy under either the "continuous treatment" doctrine or the "continuum of negligent treatment" doctrine, (b) Simpson and the hospital conspired to fraudulently conceal Kathy's injuries, and (c) Kathy was mentally ill at the time she allegedly was injured.

Our careful consideration of the record convinces us that summary judgment for Simpson and the hospital on all claims was proper. We affirm.

I. *Background Facts.*

Kathy presents a long and troubled history of alleged abuse by family members. She claims she was sexually abused as a youngster by a grandfather.

The early death of Kathy's father shattered her. This event forced Kathy's mother to work to support the family, and Kathy was sent to live with relatives. Kathy believes her mother abandoned her.

Kathy began dating Marlin as a teenager. She became pregnant and the couple married. Kathy was very concerned about how her mother viewed the pregnancy and marriage, and also had deep feelings of anger toward her mother regarding the abandonment.

During the early years of the Langners' marriage, Kathy was raped. She and Marlin were involved in extramarital affairs.

Kathy began seeking professional help in dealing with all of these issues in the early 1980s. She first went to the center in 1981, where she was diagnosed as suffering from depression. Over the next several years, a variety of individuals associated with the center treated her.

In 1987 she began counseling with Neboda, a counselor employed by the center. Allegedly, Kathy became emotionally addicted to Neboda. She called him at home, went out to dinner with him, invited him to her home, and made him bouquets of dried flowers and a wreath for Christmas.

Neboda apparently accepted her invitations and gifts but nevertheless continued to treat Kathy. Kathy claims that Neboda en-

gaged in self-disclosure during therapy sessions, discussed her treatment with another employee at the center, failed to have or follow a treatment plan, engaged in sexual improprieties, and failed to keep adequate records of her treatment.

Kathy told Neboda that her legs were weak and shaky and she thought she was experiencing a drug withdrawal. Because of these symptoms, in April 1988 Neboda referred Kathy to Simpson. Simpson was a staff psychiatrist employed by the center and had admitting privileges at the hospital.

After meeting with Kathy, Simpson concluded that she should be admitted to the hospital's psychiatric unit for evaluation. During the seven days that Kathy was an inpatient, she claims that Simpson engaged in inappropriate behavior. This allegation stems primarily from statements the Langners contend Simpson made to Kathy during the sessions he had with her while she was hospitalized. These include the following:

> "Let's get this straight, honey. I'm not going to sleep with you."
>
> "[I]t was probably just wishful thinking on your part [that you were abused by your father]."
>
> "You're next to a whore, but I'm not saying you're a whore. You know what I mean by that. In my drinking days, I would have slept with a woman like you. I know you go for wealthy men and fancy cars."

Of course, at this stage of the proceedings, whether Simpson made these statements had not been established. Because Simpson denies having made them, there is an initial material fact question on whether he did.

After her release from the hospital, Kathy returned to Neboda for treatment and immediately told him of Simpson's alleged statements. Neboda told Kathy he would investigate her allegations. He approached Simpson, who denied he had done or said anything improper in treating Kathy. Simpson allegedly stated that if Kathy thought he had done anything wrong, she could sue him. Neboda reported this to Kathy and was reluctant to discuss the issue any further with her.

Kathy called a close friend while she was still in the hospital and told her of Simpson's alleged statements. When she was released from the hospital, Kathy also contacted her family doctor of twenty years and told him the same thing, but the doctor did not believe her. After her release from the hospital, Kathy also told her husband about Simpson's alleged statements.

At some point Kathy tried to review her psychiatric records. At first Neboda refused to give them to her. She eventually did receive the records from Neboda, but contends the critical records were missing.

In October 1990 Neboda left the center. Kathy briefly continued treatment with another counselor. In late 1990 and early 1991, Kathy allegedly discovered that she had been injured by Neboda, Simpson, the hospital, and the center.

## II. *Background Proceedings.*

The Langners filed suit on September 26, 1991. All of the defendants raised the statute of limitations in Iowa Code section 614.1(9) (1989) as an affirmative defense. Simpson and the hospital moved for summary judgment. Neboda and the center moved for partial summary judgment. The district court dismissed all claims against Simpson and the hospital, and dismissed some of the claims against Neboda and the center. This appeal only involves the district court's ruling sustaining the motions for summary judgment filed by Simpson and the hospital.

We recite additional facts as they relate to the issues we discuss.

## III. *Scope of Review.*

Summary judgment is appropriate under Iowa Rule of Civil Procedure 237

> when there is no genuine issue of [material] fact and the moving party is entitled to the judgment as a matter of law. The burden of showing the nonexistence of a material fact is upon the moving party. While an adverse party generally cannot rest upon [the adverse party's] pleadings when the moving party has supported [the] motion, summary judgment is still not

proper if reasonable minds could draw different inferences and conclusions from the undisputed facts. In this respect, summary judgment is functionally akin to a directed verdict; every legitimate inference that reasonably can be deduced from the evidence should be afforded the non-moving party, and a fact question is generated if reasonable minds can differ on how the issue should be resolved.

*Randol v. Roe Enters., Inc.*, 524 N.W.2d 414, 415–16 (Iowa 1994) (citation omitted). Whether a genuine issue of material fact exists is determined by the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. Iowa R.Civ.P. 237.

### IV. *Which Statute of Limitations Applies?*

■ The petition alleges six claims against Simpson. These claims include psychiatric malpractice, intentional infliction of emotional distress, slander per se, slander, invasion of privacy, and breach of contract.

The petition alleged that the hospital—on the theory of respondeat superior—was liable for the actions of Simpson as to each of these six claims. Additionally, the petition alleged the hospital was liable on the theory of corporate negligence. Under this theory, the petition alleged the hospital (1) negligently selected, retained, and supervised Simpson, and (2) was negligent in failing to formulate, adopt, and enforce adequate rules and policies to ensure quality care for all patients. Finally, the petition alleged an intentional infliction of emotional distress claim against the hospital for allegedly failing to provide reasonable care to Kathy.

As to Simpson, the district court ruled that (1) Iowa Code section 614.1(9) barred only the psychiatric malpractice claim, and (2) Iowa Code section 614.1(2) barred all the other claims against him. And as to the hospital, the court ruled that (1) Iowa Code section 614.1(9) barred the respondeat superior claim as it pertained to the psychiatric malpractice claim against Simpson. The court also ruled that Iowa Code section 614.1(2) barred (1) the respondeat superior claim as it pertained to all the other claims against Simpson, (2) the corporate negligence

claim alleged against the hospital, and (3) the intentional infliction of emotional distress claim also alleged against the hospital.

Iowa Code section 614.1(2) is the general statute of limitations in tort cases. The statute provides that those actions founded on injuries to the person must be brought within two years after the action accrues. Iowa Code § 614.1(2).

Iowa Code section 614.1(9) is the statute of limitations pertaining to medical malpractice claims. The statute pertinently provides:

Actions may be brought within the times herein limited, respectively, after their causes accrue, and not afterwards, except when otherwise specially declared:

. . . .

9. *Malpractice. Those founded on injuries to the person* . . . against any physician . . . , or a hospital, . . . *arising out of patient care,* within two years after the date on which the claimant knew, or through the use of reasonable diligence should have known, . . . the injury or death for which damages are sought in the action, whichever of the dates occurs first. . . .

Iowa Code § 614.1(9) (emphasis added).

We agree with Simpson that Iowa Code section 614.1(9)—the malpractice statute of limitations—applies to all of the claims the Langners assert against him and the hospital. The italicized language makes clear that all injuries arising out of patient care are covered by the statute. All of the claims in the Langners' petition arose out of injuries allegedly suffered while Kathy was under the care of Simpson and the hospital.

### V. *When Does the Statute of Limitations in Iowa Code Section 614.1(9) Begin to Run?*

■ Iowa Code section 614.1(9) is of recent origin. Before its passage, this court in applying section 614.1(2)—the general statute of limitations in tort cases—had adopted the discovery rule for personal injury claims. *See Chrischilles v. Griswold,* 260 Iowa 453, 463, 150 N.W.2d 94, 100 (1967). In 1974, this court held that section 614.1(2) begins to run in a medical malpractice case when the in-

jured person "knows or can be charged with knowledge of the existence of [a] cause of action." *Baines v. Blenderman,* 223 N.W.2d 199, 202 (Iowa 1974). In adopting this rule, the court said:

> Defendants equate perception of physical harm with imputed knowledge of its origin in malpractice. That is not the meaning of the discovery rule. Knowledge of an injury may or may not be sufficient to alert a reasonably diligent person to the basis of [the] claim, depending on the circumstances of the case.

*Id.* at 201.

One year after *Baines,* the legislature passed subsection 9, a specific statute of limitations for medical malpractice. The legislature enacted subsection 9 "as part of a comprehensive package of legislation aimed at alleviating the medical malpractice insurance crisis." *Schultze v. Landmark Hotel Corp.,* 463 N.W.2d 47, 50 (Iowa 1990); 1975 Iowa Acts ch. 239, § 26. In our first decision interpreting subsection 9, we concluded it was enacted in "direct response to our decision one year earlier in *Baines." Koppes v. Pearson,* 384 N.W.2d 381, 387 (Iowa 1986). In short, subsection 9 was enacted to restrict the discovery rule under section 614.1(2). *Id.*

Subsection 9 means the statute of limitations now begins to run when the patient knew, or through the use of reasonable diligence should have known, of the injury for which damages are sought. The statute begins to run even though the patient does not know the physician had *negligently* caused the injury.

## VI. *When Did the Statute of Limitations in Iowa Code Section 614.1(9) Begin to Run In This Case?*

▊ The answer to this question turns on when Kathy knew or through the use of reasonable diligence should have known that she had sustained an injury because of Simpson's alleged statements to her. In her deposition, Kathy testified that while she was in the hospital she told a friend that she was frightened and that her psychiatrist was "crazy." She also testified that Simpson's alleged statements made her feel "frightened and terrorized" and she thought Simpson was "nuts."

Kathy further testified that after her release from the hospital she told Neboda she was concerned that Simpson's alleged statements were causing her personal problems. She also told her husband the same thing.

Within a week after her release from the hospital she told Neboda she felt that she had been mentally abused by Simpson. She also felt rage toward Simpson and did not want to see him again. She also told Neboda that she did not want to have sex with her husband nor did she want him to touch her. Kathy also testified that shortly after leaving the hospital, she began having panicky feelings and feelings of terror; at night she would wake up yelling.

In his deposition, Marlin testified that he noticed a change in Kathy immediately after she was released from the hospital. He said he thought she had stopped trusting everyone and she was no longer loving like she had been, and she was not interested in having sexual relations with him. When Marlin asked why, Kathy told him she felt like she had been violated.

And, finally, we have these exchanges in Kathy's deposition:

> Q. What I'm trying to understand is after your discharge from the hospital, were you having any other either physical or emotional problems that you in any way relate to what happened in the hospital? A. Yes.
>
> Q. What? A. When you're told you're not being believed by a family doctor that you've seen for 20 years and he's been out to your place hunting a lot, that hurts. And I was beginning to feel revictimized.
>
> Q. But do you attribute that in any way to Dr. Simpson? A. Yes, I do.
>
> . . . .
>
> Q. At that time that you were being seen by Dr. Simpson and these conversations were taking place, did you consider this to be abuse? A. Not at the time.
>
> Q. Did you later? A. Yes.
>
> Q. After you got out of the hospital? A. Yes.

Q. All right. A. Probably I didn't realize the extent of it until treatment at Golden Valley.

Q. And that was treatment that began in March of this year? A. Yes. But because I wasn't being believed, I was starting to even at that time feel revictimized that this is a bad dream. It can't be happening.

Q. When you say at that time, you're talking about right after you got out of the hospital? A. Yes. It was horrid.

Q. So at that time immediately after your hospitalization you knew that something was wrong? A. Yes.

In her motion resisting the defendants' motions for summary judgment, Kathy asserted that her injuries were not perceptible to her at the time of the defendants' wrongful acts, despite her diligence in trying to discover them. She asserted that it was not until she began counseling sessions with therapist Nancy Lindgren that she discovered her injury.

Lindgren began treating Kathy in September 1991—in fact, one day before Kathy filed her lawsuit. Lindgren has diagnosed Kathy's problem as post-traumatic stress disorder, with secondary dysthymia. Dysthymia is a form of depression. According to Lindgren, with post-traumatic stress disorder, a person has experienced a trauma that significantly affected the person's life and their functioning thereafter. The trauma can be sexual abuse, incest, a crisis, act of violence, act of war, or some environmental factor. The event has to be sufficient to place the person in some immediate fear for the person's life or well-being.

In Kathy's case, Lindgren believed four events caused or exacerbated the post-traumatic stress disorder she now suffers from: (1) the sexual abuse by her grandfather, (2) her father's death, (3) the rape, and (4) the statements Simpson allegedly made to her in the hospital. Lindgren characterized the statements as a "revictimization." According to Lindgren, the statements

[are] not [an] event causing the diagnosis of post-traumatic stress disorder. [The statements] add[ed] to what she had already experienced. [The statements] exacerbated her condition. [The statements were] especially toxic for her coming from the hands of someone who was supposed to be helpful, to assist her with recovery.

According to Lindgren, Kathy first started to experience memories of these events in late 1990.

■ We—like the district court—are convinced that no genuine issue of material fact exists as to when Kathy knew of her injury. Although subsection 9 limits the discovery rule, what we have said in applying the rule still has validity. For example, the statute begins to run when a person gains knowledge sufficient to put the person on inquiry. On that date, the person is charged with knowledge of facts that would have been disclosed by a reasonably diligent investigation. Moreover, once a person is aware that a problem exists, the person has a duty to investigate even though the person may not have knowledge of the nature of the problem that caused the injury. Seen in this light, "[t]he period of limitations is the outer time limit for making the investigation and bringing the action." *Sparks v. Metalcraft, Inc.*, 408 N.W.2d 347, 351 (Iowa 1987) (citation omitted).

Based upon the above facts, we think reasonable minds could draw only one conclusion: Kathy was aware Simpson's statements were inappropriate and that they caused her emotional and mental stress. True, she did not know medically why and how these statements affected her. But the law does not require such knowledge; the law only requires that she be aware that a problem exists.

■ Kathy was aware of the problem in April of 1988. She did not file her lawsuit until September 26, 1991, three years later. This was beyond the two-year time bar in section 614.1(9). Kathy contends that she tried to discover her injuries in 1988 but Neboda—to whom she was "emotionally addicted"—prevented her from doing so by telling her she was "nuts." She argues that a jury could reasonably infer that she neither knew, nor by objective standards could have known, that she had been injured when she left Neboda's care and secured outside help.

To support her position, Kathy relies heavily on two federal cases: *Simmons v. United States*, 805 F.2d 1363 (9th Cir.1986), and *Greenberg v. McCabe*, 453 F.Supp. 765 (E.D.Pa.1978), *aff'd*, 594 F.2d 854 (3d Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979).

Both cases involved mishandling of the transference phenomenon in psychoanalytical therapy. ("Transference is the term used by psychiatrists and psychologists to denote a patient's emotional reaction to a therapist and is 'generally applied to the projection of feelings, thoughts and wishes onto the analyst, who has come to represent some person from the patient's past.'" *Simmons*, 805 F.2d. at 1364 (citation omitted).) In both cases, the defendant mishandled the transference phenomenon by engaging in sexual relations with the patient. Significantly, in both cases, the defendant told the patient that the sexual relations would benefit therapy. In both cases the patient was heavily dependent upon the defendant. And in both cases the patient did not learn that she had suffered an injury by the improper conduct until after the statute of limitations had passed. In both cases the patient learned this information from new therapists after terminating treatment with the defendant. In these circumstances, the courts in both cases held that whether the statute had run was a fact question. *Simmons*, 805 F.2d at 1368; *Greenberg*, 453 F.Supp. at 770–72. Both courts found the plaintiff's delayed knowledge of the cause of her condition explainable in light of these factors. *Simmons*, 805 F.2d at 1368; *Greenberg*, 453 F.Supp. at 771–72.

Here there was no factual recitation that (1) Kathy was dependent on Simpson, (2) a transference phenomenon had developed between Kathy and Simpson, (3) a transference phenomenon had impeded her ability to view his treatment as in any way related to her psychological damage, (4) Simpson assured her that his statements were proper, and (5) the therapy relationship between Simpson and her had continued, which made it unreasonable to expect her to independently investigate the cause of her problems. To the contrary, the uncontroverted facts are that

none of these five factors were present. Simpson went so far as to suggest a lawsuit if Kathy thought his treatment was improper.

As Simpson points out, Kathy's argument is premised on the wrong assumption that Neboda, Simpson, the center and the hospital were in a continuous relationship in providing treatment to Kathy. In the next division, we conclude there was no such relationship. That brings us to the final issues in the case: whether the facts show any other exception to the statute of limitations bar in section 614.1(9).

VII. *Does the Continuous Treatment Doctrine or the Continuum of Negligent Treatment Doctrine Toll the Statute of Limitations in this Case?*

Kathy suggests that this court adopt the continuous treatment doctrine or the continuum of negligent treatment doctrine. We take her suggestion to mean that the language of section 614.1(9) is broad enough to include the two doctrines. Of course, Simpson and the hospital contend that the language of section 614.1(9) is not so broad. We however need not decide this issue because we conclude neither doctrine applies to the facts in this case. Our reasons for so concluding follow.

A. *Continuous treatment doctrine.* A number of courts hold that when the plaintiff is in the continuing care of the negligent actor for the same injury out of which the malpractice action arose, the statute of limitations may be tolled under certain circumstances until the end of treatment. This is the continuous treatment doctrine. *Ulrich v. Veterans Admin. Hosp.*, 853 F.2d 1078, 1080 (2d Cir.1988).

Two rationales support the continuous treatment doctrine. Under the first rationale, it is not reasonable to expect a patient under continuing care of a doctor to discover that the doctor's acts may be the cause of the injury. *Id.*

Four interrelated concerns underlie this rationale. First, a negligent doctor may conceal important information from a patient during treatment. Second, a confidential re-

lationship between doctor and patient might inhibit the patient from questioning the care given during the existence of the relationship. Third, the chance that investigating the cause of an injury will interrupt care weighs against requiring a patient to discover an injury during the course of continuous treatment. Last, the need for flexibility in determining the cause of a latent injury supports the rationale. *Id.*

The second rationale holds that it is absurd to expect a patient who is being treated by a doctor or hospital to interrupt corrective treatment by instituting suit against either while under their continuing care. *Id.* at 1081. This rationale recognizes that a patient's relationship with those caring for the patient is based upon trust in their medical skills. So if corrective treatment is necessary, it would be contrary to the patient's own interest in the patient's cure and recovery to disrupt the relationship by suing those caring for the patient. In these circumstances, it would make no sense to require the patient to sue. *Id.*

Here, neither rationale nor the concerns that underlie them justifies application of the continuous treatment doctrine. As mentioned, Kathy knew the statements Simpson allegedly made were inappropriate. Any layperson would be expected to know that. And, as mentioned, she knew she suffered some harm because of them.

As to the four concerns underlying the first rationale, we conclude as follows. First, there was no concern that Simpson would conceal the inappropriateness of the statements and resulting harm. This is so because their inappropriateness was self-evident to Kathy, and Kathy was aware of the harm they caused her. Second, the doctor-patient relationship did not inhibit Kathy from questioning Simpson's care. And in fact she terminated the relationship. She refused to keep a follow-up appointment with Simpson and refused to see him any longer. Neither Simpson nor the hospital provided any continuing care for Kathy thereafter. Third, she knew the cause of her injury and voluntarily interrupted the care she received from Simpson by terminating the doctor-patient relationship. Last, the injury from

the inappropriate statements was not latent; Kathy knew she suffered harm because of them. So there is no need for "flexibility in determining the cause of a latent injury." *Id.* at 1080.

As to the second rationale, Kathy certainly had no further trust in Simpson's medical skills following the inappropriate statements. Moreover, no amount of corrective treatment could undo the statements' inappropriateness.

As mentioned, Kathy terminated the doctor-patient relationship with Simpson. Neither Simpson nor the hospital thereafter provided continuing care for her. Kathy attempts to overcome this weakness in her case by relying on those cases in which multiple doctors were involved.

Recently one court recognized the difficulty in applying the continuous treatment doctrine when a patient has been treated by more than one doctor:

> Difficulty in applying the [continuous treatment] rule arises when a patient has been treated by more than one doctor. Under some circumstances, multiple physicians are treated as linked for purposes of the rule; in others, a change of physician breaks the chain and allows the limitations period to run. Examination of the cases does not disclose a bright-line rule showing clearly when multiple physicians are to be considered as providing continuous treatment under the rule. The cases discussed herein do make clear that a close nexus is required for a change of doctors not to break the chain.

*Tolliver v. United States,* 831 F.Supp. 558, 560 (S.D.W.Va.1993).

■ Kathy argues there is a factual question whether Simpson and the hospital had such a close nexus with Neboda who provided the prior and subsequent care. She points to several indicators. First, Neboda testified Simpson was his medical supervisor and he referred Kathy to him. Second, the hospital granted Simpson admitting privileges and the center paid Simpson "incentive income" for each patient he admitted to the hospital. Third, the hospital and the center had an agreement with each other to provide

such patients with a continuum of care. The agreement provided that upon the patient's discharge from the hospital, "center patients, in accordance with the medical judgment of the attending physician or chief medical officer of the center, shall be transferred to the center for continuing treatment, and the hospital shall facilitate such transfer . . . ."

In *Otto v. National Institute of Health*, 815 F.2d 985, 988–89 (4th Cir.1987), treating physicians at the National Institute had referred the plaintiff to doctors outside that facility for further treatment. The court considered continuing consultation among the National Institute doctors and the outside physicians as a sufficient connection for the continuous treatment doctrine to apply. *But see Brown v. United States*, 353 F.2d 578, 580 (9th Cir.1965) ("We cannot accept the proposition that one who continues to receive treatment from succeeding government physicians is, regardless of the circumstances, excused from conducting diligent inquiry into the conduct of a doctor with whom the personal relationship has been terminated and who is not claimed to have acted in direct concert with the succeeding physicians.").

Here the record is uncontroverted that once Kathy left the hospital, Simpson and the hospital had nothing more to do with her treatment either by consultation with Neboda or otherwise. Reasonable minds could reach but one conclusion: there was no close nexus between Simpson, the hospital, and Neboda relative to any subsequent treatment that Neboda provided Kathy.

▮▮▮ In addition, we think the "single act" exception would preclude application of the continuous treatment doctrine. According to the single act exception, if there is a single act of malpractice, subsequent time and effort to merely remedy or cure that act does not toll the statute of limitations. *Schmitt v. Esser*, 178 Minn. 82, 84, 226 N.W. 196, 197 (1929). A practical reason for the continuous treatment doctrine is that actionable treatment does not ordinarily consist of a single act or, even if it does, it is difficult to determine the precise time of its occurrence. Such is not the case where the alleged malpractice act is readily identified. *Swang v.*

*Hauser*, 288 Minn. 306, 309, 180 N.W.2d 187, 189–90 (1970).

In *Swang*, the court applied the single act exception, holding that the plaintiff's claim for technical assault and battery stemming from allegedly unauthorized surgery was barred by the two-year statute of limitations even though the doctor-patient relationship continued within two years of the commencement of the suit. The court reasoned that "[t]he alleged tort was a single act of surgery . . . that is, it was complete at the precise time, for no continued course of treatment could either cure or relieve it." *Id.* at 309, 180 N.W.2d at 190. *See also Goellner v. Butler*, 836 F.2d 426, 430 (8th Cir.1988) (applying Minnesota law, court similarly concluded that a patient's claim for negligence, negligent disclosure, and negligent misrepresentation against the physician and hospital regarding insertion of a Copper–7 intrauterine device was barred under the single act exception to the continuous treatment doctrine).

Recently the Minnesota court applied the single act exception to a claim of a patient who received care from a clinic as a whole rather than from an individual. *See Offerdahl v. University of Minn. Hosps. & Clinics*, 426 N.W.2d 425 (Minn.1988). The court recognized that the collective services of a medical clinic may sometimes call for extension of the continuing treatment concept:

> [W]here the patient sought treatment from a clinic as a whole rather than an individual physician, the treatment of the clinic as a whole, rather than that of the individual physician alleged to have committed the act of malpractice, is relevant for purposes of determining when treatment terminated and the statute of limitations began to run.

*Id.* at 428. Nevertheless, the court concluded the exception applied:

> A practical reason for the general "termination of treatment" rule is that actionable treatment does not ordinarily consist of a single act or, even if it does, it is most difficult to determine the precise time of its occurrence. This concern is not present in this case, as [the plaintiff] has alleged an identifiable single act by the [de-

fendant] as the basis for her negligence claim.

*Id.* at 429 (citation omitted); *accord Froysland v. Altenburg,* 439 N.W.2d 797, 800–01 (N.D.1989).

Here the inappropriate statements—like the unauthorized surgery in *Swang*—were complete at the precise time Simpson allegedly made them. No continuing course of treatment could undo them. The continuous treatment doctrine does not apply even assuming a close connection between Simpson, the hospital, and Neboda relative to Neboda's subsequent treatment of Kathy.

B. *Continuum of negligent treatment doctrine.* To prevail under the continuum of negligent treatment doctrine, the plaintiff must show "(1) that there was a continuous and unbroken course of negligent treatment, and (2) that the treatment was so related as to constitute one continuing wrong." *Cunningham v. Huffman,* 154 Ill.2d 398, 406, 182 Ill.Dec. 18, 22, 609 N.E.2d 321, 325 (1993). The statute of limitations does not begin to run until the last date of negligent treatment. *Id.*

Here there was no continuous course of negligent treatment so the doctrine does not apply. The statements Simpson allegedly made constitute the basis for Kathy's malpractice claim against Simpson and the hospital. These statements allegedly occurred at one brief period of time during April 1988—a single isolated event. This was not the classic case of the continuum of negligent treatment doctrine in which a patient is gravely injured because of negligent or unnecessary exposure to x-ray radiation or administration of medication over a span of years. *See id.*

VIII. *Did Simpson and the Hospital Conspire to Fraudulently Conceal from Kathy the True Extent of Her Injuries and the Fact That She Had a Cause of Action?*

The Langners also claim they generated a genuine issue of material fact on this issue because Simpson and the hospital conspired to fraudulently conceal from Kathy (1) the true extent of her injuries, and (2) the

fact that she had a cause of action. Simpson and the hospital counter that there is no evidence in the record to support either allegation.

Under Iowa law, proof of fraudulent concealment requires evidence of affirmative steps independent of and in addition to the original wrongdoing which prevented the plaintiff from discovering the wrongdoing. *Woods v. Schmitt,* 439 N.W.2d 855, 862 (Iowa 1989). However, "[t]he close relationship of trust and confidence between patient and physician gives rise to duties of disclosure which may obviate the need for a patient to prove an affirmative act of concealment." *Koppes,* 384 N.W.2d at 386.

Contrary to the Langners' contention, we see nothing in the record suggesting that Simpson or the hospital attempted to hide any material facts upon which the Langners' predicate their claims. Indeed the evidence suggests just the opposite occurred. When Neboda approached Simpson about Kathy's allegations, he did so at a meeting with two other employees of the center. Simpson immediately denied the charges. He stated that if Kathy was unhappy with his treatment of her, she could sue him.

In short, Kathy knew the facts that created the basis for her claims against Simpson and the hospital. Those facts were (1) the inappropriate statements Simpson allegedly made, and (2) the harm those statements allegedly caused her. Neither Simpson nor the hospital fraudulently concealed these facts.

There is likewise no proof that Simpson or the hospital withheld their treatment records from the Langners, whose burden it was to establish such facts. The Langners assert that Neboda initially refused to provide his treatment records. When Neboda finally did provide his treatment records, the records were incomplete. Assuming these allegations were true, they are not relevant to the question of conspiracy and fraud by the hospital and Simpson in regard to *their* treatment records. Indeed, the Langners do not mention Simpson's or the hospital's treatment records—and if or how these were released to them—at all. We are unable to

conclude from this record that Simpson or the hospital took affirmative steps independent of and in addition to the wrongdoing which prevented the Langners from discovering Simpson's alleged impropriety.

From all of this, reasonable minds could only conclude that the Langners had at their disposal what information regarding Kathy's treatment was available in Simpson's and the hospital's files.

## IX. *Was Kathy Suffering From Mental Illness Such as to Toll the Statute of Limitations?*

■ Iowa Code section 614.8 provides:

The times limited for actions herein, except those brought for penalties and forfeitures, shall be extended in favor of minors and mentally ill persons, so that they shall have one year from and after the termination of such disability within which to commence said action.

The statute of limitations is not tolled if the person has a mental illness not rising to the level of a disability such as to prevent the person from filing a lawsuit. In short, the disability must be such that the plaintiff is not capable of understanding the plaintiff's rights.

■ The Langners argue that, at the time of the acts complained of, Kathy was mentally ill to the extent of being disabled under section 614.8. Simpson and the hospital counter there is no record evidence that Kathy was so disabled with mental illness that she could not file her lawsuit within the two-year period.

Recently, the Eighth Circuit had occasion to interpret section 614.8. *See Dautremont v. Broadlawns Hosp.*, 827 F.2d 291 (8th Cir. 1987). The plaintiff in *Dautremont* had been adjudged to be incompetent, that is, seriously mentally impaired. He suffered from schizophrenia, paranoid type. He was hospitalized in 1979 and 1980. He filed his lawsuit in 1983. Two days later he was again adjudged to be incompetent.

The court held that the lawsuits for the 1979 and 1980 hospitalizations were time barred, concluding:

While the issue whether a person is mentally ill for purposes of the tolling statute is factual, the record before us demonstrates as a matter of law that the tolling statute is inoperative in the circumstances of this case. We cannot simply presume that because Dautremont was found to be mentally impaired he was mentally ill for the purposes of the tolling statute. To the contrary, Iowa Code [section] 229.27 provides:

Hospitalization of a person under this chapter, either voluntarily or involuntarily, does not constitute a finding of nor equate with nor raise a presumption of incompetency, nor cause a person so hospitalized to be deemed a person of unsound mind nor a person under a legal disability for any purpose including ... [section] 614.8 [the tolling statute].

*Id.* at 296; *see also Altena v. Altena*, 428 N.W.2d 315, 317 (Iowa Ct.App.1988) (holding that there was no evidence to support finding that woman who had sued cousin for damages resulting from alleged sexual abuse was mentally ill or severely depressed within statute permitting tolling of two-year limitation period applicable to personal injury torts; testimony by experts did not indicate that woman was mentally ill, severely depressed, or incapable of understanding her rights, but that she had suffered from an atypical depression without psychosis and had been hospitalized for period of time).

The record shows that Kathy, at the time Simpson treated her, was diagnosed as being depressed. Proof of depression—without more—is not proof of disability due to mental illness. The Langners presented no evidence, expert or otherwise, that indicated that Kathy was disabled because of mental illness to such an extent that she was unable to file her lawsuit.

## X. *Conclusion.*

Iowa Code section 614.1(9) is the applicable statute of limitations as to all the claims against Simpson and the hospital. None of the exceptions alleged by the Langners to the time limitation of section 614.1(9) tolled this statute of limitations. The Langners filed these claims long after the two-year

time limitation in section 614.1(9) had expired. So the district court correctly granted summary judgment to Simpson and the hospital on all claims against them.

Finding no error, we affirm.

**AFFIRMED.**