Joseph W. KESTEL, Plaintiff–
Appellant/Cross–Appellee,

v.

John F. KURZAK, John P. Perdue and
The Diocese of Sioux City, Defendants–
Appellees/Cross–Appellants.

No. 10–1272.

Court of Appeals of Iowa.

July 13, 2011.

Patrick Hopkins, West Des Moines, and R. Scott Rhinehart, Sioux City, for appellant.

James Redmond and Michael Ellwanger, Sioux City, for appellees.

Heard by VAITHESWARAN, P.J., and POTTERFIELD and TABOR, JJ.

TABOR, J.

Today we are asked to decide whether a victim of alleged sexual abuse timely filed his lawsuit against John Kurzak, a Roman Catholic priest; John Perdue, a former priest; and the Diocese of Sioux City. Joseph Kestel appeals from the grant of summary judgment to these defendants on their statute-of-limitations claim. Kestel commenced his action in 2008 based upon incidents of sexual abuse that allegedly occurred in 1982 and 1983. The district court applied the discovery rule, but decided as a matter of law that Kestel was on inquiry notice of his injury as early as 1989 when he sought treatment for anxiety and depression. Kestel asserts he did not discover the causal connection between the defendants' conduct and his injury until a therapeutic breakthrough in 2006.

Under Iowa's existing case law we must conclude the discovery rule did not toll the two-year statute of limitations under Iowa Code section 614.1(2) (2009) because Kestel knew the acts of Kurzak and Perdue were abusive and caused him harm at the time they were committed.[1] At a mini-

---

1. We reach the same conclusion in the appeal involving another plaintiff who filed his cause of action during a similar time frame against the same three defendants. *Steinke v. Kurzak,*

mum, reasonable minds could not differ that by 1989 or 1990, Kestel was on inquiry notice concerning his injury and its cause.

We also reject Kestel's claim that Iowa Code section 614.8(1) extended the time for him to file his lawsuit. That provision, even after its revision, requires the plaintiff to show that his mental disability rendered him unable to pursue the cause of action and Kestel is unable to make that showing. Because we affirm on the statute-of-limitations ground, it is not necessary to address the court's other bases for granting summary judgment.

## I. Background Facts and Proceedings

Because Kestel's contentions regarding what he knew and did not know concerning his injury and its cause at the time the alleged abuse occurred are critical to our decision regarding when the cause of action accrued, we outline his evidence presented in opposition to the defendants' summary judgment motions.

Joseph Kestel grew up in a devout Roman Catholic household. In their farm home outside of Schaller, his parents regularly hosted their parish priest, a figure that Kestel learned to hold in high regard. Kestel aspired to the priesthood himself, and in 1981 he was accepted as a candidate for the seminary under the sponsorship of the Diocese of Sioux City. During a seminarian retreat in January 1982, Kestel—then eighteen years old—was introduced to John Perdue, a diocesan seminary student. Perdue, who was thirty-four years old at the time, befriended Kestel through an exchange of letters.

Kestel alleges that in March 1982 he met Perdue in Emmetsburg for dinner. Perdue ordered alcoholic beverages for Kestel, who recalls becoming intoxicated for the first time. While riding in Perdue's car, Kestel shared his "secret" that he "masturbated a lot and that [he] had thoughts of boys." Kestel explained in his deposition: "At that time I did not know what gay was." Perdue responded that he would provide Kestel "the kind of counseling and religious support" he needed. Perdue's mother lived in Emmetsburg and Perdue took Kestel to her home around midnight. Perdue told Kestel that "one of the best cures" for the anxiety he was feeling would be a back massage. Kestel remembers Perdue showing him to the guest room and telling him to strip down to his underwear and lay on the bed on his stomach. Kestel became aroused from the back rub, and Perdue told him it was "natural" and he should not be ashamed. According to Kestel, Perdue removed Kestel's underwear and performed fellatio. Kestel told Perdue to stop because he was very uncomfortable but Perdue continued the oral sex until Kestel broke down sobbing. According to Kestel's deposition, the next morning Perdue asked for his forgiveness saying, "that is what good Catholics do, they forgive." Perdue also told Kestel to keep their sexual encounter a secret because Kestel could be forced out of the seminarian program if he shared the information with anyone.

Kestel recalls being so distraught that he "ran to the confessional" at his home parish the next afternoon. He told his priest, Father Divine, about the sexual contact with an older seminarian. Kestel alleges Father Divine told him that "it takes two to tango" and that Kestel must have done something to entice Perdue. According to Kestel, Father Divine also told him it would be best to "move on" and "forgive John and live [his] life as though it didn't happen."

Kestel also points to an incident with Perdue during the summer of 1982. Perdue and his friend, Father John Kurzak, invited Kestel to spend the weekend at a cabin on Twin Lakes in Calhoun County. Several other students, seminarians, and priests also joined the gathering. Kestel described the weekend as a rather raunchy affair; several times a day Perdue or Father Kurzak would "grab [his] crotch and say 'how's it hangin'.'" According to Kestel, Perdue and Kurzak also supplied pornographic magazines and videotapes and served alcohol to the under-aged males who were present. Kestel possessed photographs documenting the weekend activities. Kestel was invited back to the Twin Lakes cabin during the summer of 1983, and decided to attend only after Perdue assured him they would "tone it down" from the previous year. But Kestel recalls the same type of sexually charged behavior the second year, including "skinny dipping," "grabbing" of genitals, and photographing inappropriate poses of the young men invited to the gathering.

Kestel attended St. John's University from 1982 through 1986 and earned an undergraduate degree in liturgical music. He testified that at St. John's he had positive relationships with the priests and monks. He observed:

> Prior to 1982, my experience to priests in that realm of abusers were Kurzak ... [and] Perdue, and I basically spent my years at St. John's wanting to think that they were the anomaly, that they weren't the standard. So I spent those four years trying to forget and move beyond my hurt and my pain.

Kestel attended seminary in 1986 and 1987, but did not receive a theology degree. Kestel then worked as a liturgical musical director at two parishes in St. Cloud, Minnesota from 1987 through 1994. Around 1996, he "more or less" left the Catholic church after becoming "dissatisfied with the hypocrisy he saw in the priesthood." At this point, he switched careers and went into business. In 2000, he earned his master's degree in information technology from St. Cloud State. He is now a partner in a business consulting firm.

Kestel began treatment for depression in 1989, though he acknowledged in his deposition testimony that he suffered symptoms of depression "way before" he sought professional help. To address his anxiety and depression, Kestel consulted his physician and then participated in therapy with at least two psychologists over the years. One of his therapists was Doug Jensen, who Kestel saw for more than ten years. But Kestel contends it was not until a counseling session with Jensen in October 2006 that Kestel connected his emotional damage with the alleged abuse by Perdue and Kurzak. According to both Kestel and Jensen, Kestel experienced a "revelatory moment" when Jensen pushed for details and Kestel suddenly linked his years of depression and adjustment problems to his sexual abuse by Perdue and Kurzak.

As for Perdue, he worked as a disc jockey in Fort Dodge in the 1970s and met Father Kurzak while covering the visit to Iowa by Pope John Paul II. In 1979, Perdue expressed an interest in becoming a priest. After finishing college classes at Briar Cliff in 1981, he entered the Sacred Heart Seminary in Wisconsin. He was ordained in 1985 and assigned to a parish in Carroll, Iowa. While he was in that position, Perdue came to the attention of the bishop for holding questionable get-togethers with students. In June 1986, his housekeeper found inappropriate photographs in Perdue's room. The bishop relieved Perdue of his assignment and sent him for evaluation. Perdue eventually left

the priesthood. Kestel maintained a friendship with Perdue until 1990, when Kestel told Perdue during a telephone call that he was "a sick man" and that he did not want to hear from him again.

The summary judgment record provides less background information about Father Kurzak, indicating only that he was ordained in 1975 and left his duties as a diocesan priest in Fort Dodge to serve as a military chaplain in 1981.

On March 23, 2008, Kestel filed a petition at law against defendants Kurzak, Perdue, and the Diocese. The petition alleged eight counts: (I) Perdue used his position of trust to sexually abuse Kestel, (II) the Diocese was liable for the acts committed by Perdue and Father Kurzak based on the doctrine of respondeat superior, (III) the Diocese engaged in negligent supervision of Perdue and Kurzak, (IV) Diocesan officials intentionally prevented assistance to Kestel, (V) intentional infliction of emotional distress by the Diocese, (VI) intentional infliction of emotional distress by Kurzak, (VII) intentional infliction of emotional distress by Perdue, and (VIII) fraud. All three defendants filed answers denying the claims and asserting affirmative defenses, including the contention that the action was barred by the statute of limitations. The defendants also filed motions for summary judgment, alleging no genuine issue of material fact existed and reiterating the argument that the action was filed outside the two-year statute of limitations at Iowa Code section 614.1(2).

The district court ruled in favor of the defendants, concluding the statute of limitations had expired on Kestel's cause of action. The district court also determined that the Diocese was not liable for any acts of sexual abuse by Perdue or Kurzak. Kestel appeals from the grant of summary judgment.

## II. Scope and Standard of Review

The district court may dispose of a claim barred by the applicable statute of limitations by granting summary judgment. *Stahl v. Preston Mut. Ins. Ass'n,* 517 N.W.2d 201, 202 (Iowa 1994). But statutes of limitations are disfavored. *Rock v. Warhank,* 757 N.W.2d 670, 676 (Iowa 2008). " 'When two interpretations of a limitations statute are possible, the one giving the longer period to a litigant seeking relief is to be preferred and applied.' " *Id.* (citation omitted).

We review a summary judgment ruling for correction of legal error. *Rathje v. Mercy Hosp.,* 745 N.W.2d 443, 447 (Iowa 2008). Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits reveal no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. *Hegg v. Hawkeye Tri–County REC,* 512 N.W.2d 558, 559 (Iowa 1994). On appeal of a summary judgment ruling, we must decide whether a genuine issue of material fact exists, and if the district court correctly applied the law. *Id.* The evidence presented must be viewed in the light most favorable to the party opposing the motion for summary judgment. *Murtha v. Cahalan,* 745 N.W.2d 711, 713–14 (Iowa 2008). "On appeal we 'indulge in every legitimate inference that the evidence will bear in an effort to ascertain the existence of a fact question.' " *Id.* (citation omitted).

## III. Analysis

### A. Common Law Discovery Rule

In Iowa, a two-year statute of limitations governs most tort claims. Iowa Code § 614.1(2). "While the legislature prescribes the period of limitation, courts have generally been called upon to deter-

mine when a claim accrues to start the running of the statute of limitations." *Rathje,* 745 N.W.2d at 448. "This task has been formidable, largely due to the manifold sequences in which the elements of a tort action can unfold and become discernible to a plaintiff as a signal to pursue a legal remedy for a wrong." *Id.*

More than forty years ago, our supreme court established that the statutory limitations period does not start to run "until [the] plaintiff has in fact discovered that he has suffered injury or by the exercise of reasonable diligence should have discovered it." *Chrischilles v. Griswold,* 260 Iowa 453, 463, 150 N.W.2d 94, 100 (1967) (superseded by statute). In further articulating its discovery rule, our supreme court held in a child sexual-abuse case that a claim "does not accrue until the plaintiff knows or in the exercise of reasonable care should have known both the fact of the injury and its cause." *Callahan v. State,* 464 N.W.2d 268, 273 (Iowa 1990).

Our supreme court has also embraced the concept of "inquiry notice" as a means to determine the outer time limit for bringing a cause of action. *Woodroffe v. Hasenclever,* 540 N.W.2d 45, 48 (Iowa 1995). The court defined inquiry notice as being " 'aware of facts that would prompt a reasonably prudent person to begin seeking information as to the problem and its cause.' " *Id.* (citation omitted). That moment of awareness begins the running of the statute of limitations. *Id.* The court pointed out

the duty to investigate does not depend on exact knowledge of the nature of the problem that caused the injury. It is sufficient that the person be aware that a problem existed.[2] One purpose of inquiry is to ascertain its exact nature.

*Id.* at 48–49 (citation omitted).

In the instant case, the district court held that Kestel "was on inquiry notice as early as 1989" when he first realized that he suffered from anxiety and depression. The court rejected Kestel's claim that his cause of action did not accrue until he actually associated the alleged abuse with his mental health problems, reasoning:

> Kestel never felt like he was a victim of abuse until his breakthrough session with Jensen. While he may have underestimated the effect of Perdue's conduct on his life, it would stretch the discovery rule's purpose to allow him to pursue a cause of action when he knew he was abused; knew the conduct was wrongful; and he knew of his injuries.

Kestel contends on appeal that the district court misapplied the discovery rule by assuming that after being diagnosed with depression in 1989, "a reasonable investigation would have revealed the connection between the abuse and the injury as a matter of law." He points to the affidavit of Dr. Gary Schoener to support his position that a specific psychological problem can have multiple causes and neither Kestel nor the professionals who treated him recognized sexual abuse as the cause of his depression until the "eureka" moment with therapist Jensen in October 2006.[3]

2. When opining that a plaintiff only needs to be aware that a problem exists to start the statute running, the court intended the term "problem" to encompass both the injury and its cause in fact. *See Rathje,* 745 N.W.2d at 460.

3. Dr. Schoener notes in his affidavit:

> Mr. Kestel struggled with problems in relationships, depression, anxiety, and sleep difficulties and received psychotherapy and medications. These problems came and went many times throughout his adult life. Neither Mr. Kestel nor the professionals who treated him linked any of these problems to sexual abuse by Mr. Perdue although he revealed it to them as part of

The defendants counter that using a reasonable person standard, Kestel had enough information to alert him to the need to investigate the link between the alleged abuse and his depression long before 2006. In its brief, the Diocese argues that the statute of limitations expired in March 1984, two years after Kestel alleges he was sexually abused by Perdue, reasoning "Kestel was aware that a problem existed as soon as it occurred."[4] In his brief, Kurzak asserts that by 1990, at the latest, Kestel was on inquiry notice because he was aware of the abuse, the inappropriateness of it, and its effects on him.

■ Kestel does not deny retaining memories of the alleged abuse, but testified that he "stuffed it all aside" after cutting off his friendship with Perdue. Kestel's continuous recollection of the alleged abuse does not—standing alone—render his cause of action untimely. A plaintiff's "mere knowledge of abuse" will not necessarily trigger the statute of limitations in every case. *Frideres v. Schiltz,* 113 F.3d 897, 899 (8th Cir.1997). Rather,

> a person who has always remembered some specific act or acts of sexual abuse may rely on the discovery rule in those instances where the nexus between those specific acts and the claimed injuries is not discovered until a time less than two years prior to commencement of the action.

*Frideres,* 113 F.3d at 899 (citation omitted). But, in that case, the Eighth Circuit Court of Appeals, relying on the Iowa cases of *Woodroffe* and *Borchard v. Anderson,* 542 N.W.2d 247 (Iowa 1996), determined as a matter of law that Frideres's action was time barred because she "remembered the abuse and was aware of

enough of its effects to seek help more than two years prior to the commencement of her action." *Id.*

In *Woodroffe,* the court determined the plaintiff was on inquiry notice when she first consulted with a psychologist after seeing a television show about child sexual abuse that sparked a memory of her own childhood trauma because at that time she "remembered the abuse and was aware enough of its effect to seek professional help." *Woodroffe,* 540 N.W.2d at 47. During her initial therapy session the plaintiff had related specific recollections of abuse perpetrated by her uncle and told the therapist she realized she would have "to face some of these painful experiences" if she was going to "get over" her feelings toward her uncle. *Id.*

In *Borchard,* the plaintiff alleged that her husband "repeatedly committed acts of severe domestic abuse upon her," including beating her while she was eight months pregnant and terrorizing her with a gun. 542 N.W.2d at 248. The couple divorced in 1981. *Id.* In July 1993, Borchard was diagnosed with posttraumatic stress disorder (PTSD) caused by the domestic violence. *Id.* She filed suit alleging an intentional tort against her ex-husband in December 1993; the trial court found the action was time barred and granted summary judgment. *Id.* at 249. Borchard appealed, invoking the common law discovery rule and contending that she did not understand the connection between the domestic abuse and her emotional difficulties until her PTSD diagnosis. Our supreme court held that the plaintiff's situation did not trigger the discovery rule because

> [s]he was aware the domestic abuse inflicted by [her husband] was inappropri-

---

routine psychiatric and psychological history taking.

4. Perdue adopts the argument made by the Diocese.

ate and that it caused her harm. She may not have known medically why and how this abuse had and still does affect her. The law however does not require such knowledge; the law requires only that she be aware of the existence of a problem.

*Id.* at 251.

In *Borchard,* the Iowa Supreme Court distinguished its earlier decision in *Callahan,* 464 N.W.2d at 271–72, which "recognized that psychologically repressed memories may sometimes serve to toll the statute of limitations." *Id.* at 250. In contrast to the child victim in *Callahan,* Borchard could "make no cognizable claim that she repressed all memories of domestic abuse." *Id.*

■ With Iowa's discovery-rule history at our backs, we now confront the question whether Kestel knew enough about his injury and its cause at the time of the alleged sexual abuse in 1982 and 1983—or at least when he sought treatment for anxiety and depression in 1989—to be on inquiry notice so as to start the clock on his cause of action. Like the plaintiffs in *Woodroffe* and *Borchard,* Kestel remembered the sexual acts perpetrated by Perdue and Kurzak, considered them to be nonconsensual and abusive, and knew from the time of their commission that they caused him pain. Kestel's claim that he did not recognize the wrongful acts as the cause of his anxiety and depression until a counseling session more than two decades later does not entitle him to tolling under the delayed discovery rule, given its interpretation by our supreme court in *Woodroffe* and *Borchard.* Under those precedents, Kestel's cause of action accrued at the time he allegedly suffered the abuse because he was immediately "aware of the existence of a problem." *See Borchard,* 542 N.W.2d at 251 (citation omitted). His awareness was evident from his deposition

testimony that while he attended college at St. John's from 1982 through 1986, he wanted to believe that "abusers" like Perdue and Kurzak "were the anamoly" in the Catholic church. He also testified he "spent those four years trying to forget and move beyond my hurt and my pain."

Alternatively, Kestel's cause of action accrued at the latest in 1989 or 1990. In 1989, Kestel realized he suffered an injury that manifested itself in the form of depression and anxiety. Kestel told his therapists about the abuse as part of routine psychological history taking. We agree with the district court that a reasonable person who was both aware of the abuse and aware of the injury would be placed on inquiry notice to discover the connection between the two. *See Woodroffe,* 540 N.W.2d at 48 (explaining " 'statute of limitations begins to run when a plaintiff first becomes aware of the facts that would prompt a reasonably prudent person to begin seeking information as to the problem and its cause' " (citation omitted)). We also are persuaded that Kestel was on notice as to the source of his emotional turmoil in 1990 when he ended his relationship with Perdue, calling him a "sick man."

The facts in the summary judgment record regarding Kestel's knowledge of the alleged abuse and his decision to seek professional help for his injury and to cut ties with the perpetrator leave no room for reasonable minds to differ that his cause accrued more than two years prior to the commencement of this action. Under these circumstances, Kestel cannot benefit from tolling under the delayed discovery rule. His suit was filed outside the statute of limitations. In affirming the grant of summary judgment, we share the district court's sentiment that "if Kestel's allegations are true, he has been victim to a tragic series of events." But we are con-

strained by prior judicial interpretations of Iowa's discovery rule to find that the statute of limitations prevents Kestel from pursuing his accusations of egregious behavior on the part of the Perdue and Kurzak.

### B. Tolling on Account of Mental Illness

Kestel also argues that his time for filing the cause of action should have been tolled under Iowa Code section 614.8(1),[5] which extends the limitations period in favor of persons with mental illness, providing "one year from and after the termination of the disability within which" to commence an action. He contends the district court erred in concluding that legislative amendments to the tolling provision in 1996 and 1997 did not create a factual question whether his diagnosis of depression allowed him an extension of time in which to file his action.

 The Diocese charges that Kestel failed to preserve error on this issue by not raising it in the district court. On appeal, the Diocese asserts that the plaintiff in a companion case urged that section 614.8(1) tolled the statute of limitations, but that Kestel did not do so. Kestel admits in his reply brief that he did not discuss section 614.8(1) until he filed a motion pursuant to Iowa Rule of Civil Procedure 1.904. But he contends it was not necessary to do so earlier because his primary argument was that his cause of action did not accrue until 2006, and only when the district court rejected that accru-

al date did the tolling provisions come into play.

We note that the Diocese filed a resistance to Kestel's rule 1.904 motion in the district court that did not challenge the timeliness of the plaintiff's tolling argument, but rather contested the merits of Kestel's claim that the amendments to section 614.8(1) expanded the mental-health exception to the statute of limitations. The Diocese had an opportunity to challenge Kestel's preservation of the tolling issue in the district court, but did not do so. *Cf. Meier v. Senecaut*, 641 N.W.2d 532, 540 (Iowa 2002) (noting that error preservation rules require the party seeking to raise an issue on appeal to call the district court's attention to its failure to decide that question). Because the Diocese responded to Kestel's tolling argument in the district court and because the court ruled on that ground, we find the issue preserved.

 Turning to the merits of Kestel's argument, we see no error in the district court's analysis of the statutory language. Kestel contends that the 1996 amendment[6] substituting the phrase "persons with mental illness" for the term "mentally ill persons" signaled a legislative intent to broaden the application of the tolling provision and allow persons with depression or comparable mental illnesses to file outside the statute of limitations, regardless of their ability to understand their rights. We disagree with his contention.

---

5. Iowa Code section 614.8(1) provides as follows:

 The times limited for actions in this chapter, or chapter 216, 669, or 670, except those brought for penalties and forfeitures, are extended in favor of persons with mental illness, so that they shall have one year from and after the termination of the disability within which to file a complaint

 pursuant to chapter 216, to make a claim pursuant to chapter 669, or to otherwise commence an action.

6. Kestel also discusses the 1997 amendment that separated the tolling provisions for minors and those with mental illnesses and changed the phrase "termination of such disability" to "termination of the disability."

As the district court opined: "Under the theories of Kestel's counsel, a lifetime struggle with depression would result in an unlimited statute of limitations even though the sufferer was capable of litigating his rights." We share the district court's opinion that the legislature did not intend such a result.

The enactment that changed the wording of section 614.8 also reworded thirty-nine other statutes. *See* 1996 Iowa Acts ch. 1129 § 1(15) (entitled "An Act Relating to the Terminology Used to Describe Persons with Certain Mental Illnesses and Physical Conditions and Providing for Related Matters Concerning Persons with Mental Illness"). We agree with the district court's astute observation about the legislative intent: "These identical changes to the other statutes may ... suggest the legislature did not mean to make specific changes to § 614.8, but instead had decided that it is preferable to designate people as 'persons with mental illness' as opposed defining them as 'mentally ill persons.'"

Because the 1996 amendment was a matter of semantics rather than a substantive change to section 614.8, we find that the cases interpreting the pre–1996 statute are still viable. Specifically, we are bound by our supreme court's view:

> The statute of limitations is not tolled if the person has a mental illness not rising to the level of a disability such as to prevent the person from filing a lawsuit. In short, the disability must be such that the plaintiff is not capable of understanding the plaintiff's rights.

*Langner v. Simpson,* 533 N.W.2d 511, 523 (Iowa 1995) (holding that proof of depression without more was not proof of a disability due to mental illness); *see also Altena v. Altena,* 428 N.W.2d 315, 317 (Iowa Ct.App.1988) (holding there was no evidence to support finding that woman who had sued cousin for damages resulting from alleged sexual abuse was mentally ill or severely depressed within statute permitting tolling of two-year limitation period applicable to personal injury torts).

Kestel does not allege he was so depressed as to be incapable of understanding his right to file a lawsuit. In fact, despite his battle with depression and anxiety, Kestel obtained an advanced degree and has operated a successful consulting business. His mental condition has not resulted in his inability to conduct the normal affairs of life. *See Borchard,* 542 N.W.2d at 249–50. Accordingly, he cannot take advantage of the tolling provisions in section 614.8(1).

Having found the action time barred as to all three defendants, we need not address the vicarious liability claims against the Diocese.

**AFFIRMED.**