**James Dennis SCHLOTE and Nancy Schlote, Appellees,**

v.

**Douglas E. DAWSON, Appellant.**

No. 02–1143.

Supreme Court of Iowa.

Jan. 22, 2004.

Rehearing Denied March 23, 2004.

Chad M. VonKampen and James E. Shipman of Simmons, Perrine, Albright & Ellwood, P.L.C., Cedar Rapids, for appellant.

Martin A. Diaz, Iowa City, for appellees.

LAVORATO, Chief Justice.

In this medical malpractice case, the district court denied the defendant's motion for summary judgment. The defendant contended Iowa Code section 614.1(9) (2001)—Iowa's medical malpractice statute of limitations—barred the plaintiffs' claims. The district court found that a genuine issue of material fact existed on this issue. Because we disagree, we reverse and remand with directions.

## I. Scope of review.

We review a summary judgment ruling for correction of errors at law.

Summary judgment is appropriate under Iowa Rule of Civil Procedure 1.981 only when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. We examine the record before the district court to determine whether any genuine issue of material fact exists and whether that court correctly applied the law. Summary judgment is the appropriate remedy where questions of statutory interpretation are involved.

*Hegeman v. Kelch,* 666 N.W.2d 531, 533 (Iowa 2003) (citations omitted).

## II. Background Facts and Proceedings.

A family doctor referred James Dennis Schlote to Dr. Douglas E. Dawson for a sore throat. Schlote's first contact with Dr. Dawson was May 2, 1996. On that date Dr. Dawson told Schlote he had cancer of the throat, and the cancer was lying on top of his voice box. Dr. Dawson also told Schlote that he needed an operation to remove his voice box and without the operation he would die. Dr. Dawson did not tell Schlote that radiation treatment rather than surgery might be an option. Nor did he tell Schlote about a more conservative surgery that might avoid a complete removal of his voice box. Schlote agreed to the surgery to remove his voice box.

On May 21 Dr. Dawson surgically removed Schlote's voice box. Because of the surgery, Schlote lost his voice. Before the surgery, Dr. Dawson told Schlote this would happen.

In August 1998, Schlote's daughter visited him from California. She suggested that Schlote get his medical records, which he did. Schlote took the records to Dr. Guy McFarland, one of Dr. Dawson's former partners. In August 1997 the partners had removed Dr. Dawson as a partner after they learned that Dr. Dawson had become addicted to a narcotic. Dr. McFarland told Schlote to submit the records to the Iowa Board of Medical Examiners, which Schlote did.

In December 1999, the Iowa Board of Medical Examiners suspended Dr. Dawson's medical license for, among other things, excessive surgery. Two months later on February 17, 2000, Schlote and his wife sued Dr. Dawson. The Schlotes claimed Dr. Dawson was negligent because the surgery he performed was unnecessary and excessive. Schlote's wife claimed Dr. Dawson's negligence caused her a loss of consortium.

Later, Dr. Dawson moved for summary judgment, contending that Iowa Code section 614.1(9) barred the medical malpractice claims of both plaintiffs. Section 614.1(9) provides that medical malpractice claims must be brought "within two years after the date on which the claimant knew, or through the use of reasonable diligence should have known ... [of] the *injury* or death *for which damages are sought* in the action...." Iowa Code § 614.1(9) (emphasis added).

Dr. Dawson contended that the "injury" for purposes of section 614.1(9) was Schlote's loss of his natural voice. This injury, Dr. Dawson argued, was known to Schlote more than two years before he filed suit and for that reason the suit was time-barred.

In contrast, the Schlotes maintained that the "injury" for purposes of section 614.1(9) was the excessive surgery resulting in the unnecessary removal of Schlote's voice box. The earliest that Schlote became aware of a potential problem was in August 1998 when Dr. McFarland told him to submit his medical records to the Iowa Board of Medical Examiners. This was

less than two years before February 17, 2000, the date the Schlotes filed suit. Therefore, according to the Schlotes, section 614.1(9) did not bar the lawsuit.

The Schlotes had a fallback position. They contended the doctrine of fraudulent concealment applied to prevent the statute of limitations from running until Schlote discovered the medical malpractice claim. The Schlotes argued the doctrine applied because Dr. Dawson did not tell Schlote that removal of his voice box was unnecessary and that he—Dr. Dawson—had a drug problem.

The district court denied Dr. Dawson's motion for summary judgment. The court found that a genuine issue of material fact existed about whether Schlote was aware of the injury and about whether the fraudulent concealment doctrine applied.

Dr. Dawson filed an application for interlocutory appeal, which we granted.

### III. Issues.

Dr. Dawson raises the following issues: (1) whether the district court erred in finding that there was a genuine issue of material fact about whether Schlote was aware of the injury more than two years before the Schlotes filed suit, and (2) whether the district court erred in finding that there was a genuine issue of material fact about whether the fraudulent concealment doctrine applied in this case.

### IV. Discovery of Injury.

**A. Background.** Before beginning our analysis, we think it would be helpful to review the case law about statute of limitations for private-party medical malpractice actions before and after the legislature passed Iowa Code section 614.1(9). In *Schnebly v. Baker*, this court noted that the general rule in tort cases is that the period of limitations commences when the tort is committed. 217 N.W.2d 708, 721

(Iowa 1974). The court also noted that courts had developed two exceptions, "both founded on the unawareness of the plaintiff of his injury or of its cause." *Id.* The one exception was the discovery rule and the other was the fraudulent concealment doctrine. *Id.* at 721–22. Finally, the court explained that both exceptions were part of the Iowa law. *Id.*

Several years before *Schnebly*, this court adopted the discovery rule for negligence actions generally in *Chrischilles v. Griswold*, 260 Iowa 453, 463, 150 N.W.2d 94, 100 (1967) (plaintiff unaware of defective design until water dripped through ceiling). In *Chrischilles*, the court noted the general rule is that a cause of action accrues when the aggrieved party has a right to initiate and maintain a suit. 260 Iowa at 461, 150 N.W.2d at 99. A cause of action for negligence does not accrue until there is an injury resulting from the negligence. *Id.* The statute of limitations does not begin to run until the cause of action accrues. *Id.* at 461, 150 N.W.2d at 100.

In *Chrischilles*, the court, in adopting the discovery rule as an exception to the statute of limitations, expressed the discovery rule this way: "[A] cause of action based on negligence does not accrue until plaintiff has in fact discovered that he has suffered injury or by the exercise of reasonable diligence should have discovered it. . . ." *Id.* at 463, 150 N.W.2d at 100. By "injury," the court meant "injury to [the plaintiff's] interest." *Id.* at 463, 150 N.W.2d at 101; *see also* 51 Am.Jur.2d *Limitations of Actions* § 148, at 546 (2000) ("The test to determine when a cause of action arises or accrues is when the plaintiff has suffered a legal injury, that is, when he or she has the right to maintain an action. . . .")

In applying Iowa Code section 614.1(2)—the general statute of limitations

in tort cases for injuries to the person—this court in *Baines v. Blenderman* adopted the discovery rule in a medical malpractice case. 223 N.W.2d 199, 201–02 (Iowa 1974). In *Baines*, during the course of surgery to repair the plaintiff's herniated disc, the plaintiff lost the vision of his right eye apparently because the blood supply to the eye was cut off for two or more minutes during the operation. The plaintiff discovered four months after the operation that the defendant had negligently caused the injury, and the plaintiff did not file suit until two years and two months after the surgery. *Id.* at 200, 203.

In *Baines*, the court noted that in *Chrischilles*, the court had approved the following statement from *Johnson v. Caldwell*, 371 Mich. 368, 123 N.W.2d 785, 791 (1963), a medical malpractice case: "The limitation statute or statutes in malpractice cases do not start to run until the date of discovery, or the date when, by the exercise of reasonable care, plaintiff should have discovered the wrongful act." 223 N.W.2d at 201.

Significantly, in *Baines*, the court rejected the defendant's contention that perception of physical harm equates with imputed knowledge of its origin in malpractice. In response, the court stated: "Knowledge of an injury may or may not be sufficient to alert a reasonably diligent person to the basis of his claim, depending on the circumstances of the case." *Id.*

*Baines* interpreted the discovery rule to mean that the statute of limitations "does not begin to run until the injured person knows or can be charged with knowledge of the existence of his cause of action." *Id.* The court continued:

[I]t is not necessary to prove the plaintiff knew the specific negligence of the defendant nor that he knew the details of the evidence by which to prove the cause of action. It is enough that he knew or may be reasonably charged with knowledge of sufficient facts to be aware he had a cause of action more than two years before it was brought. *Id.*

Finally, the court noted that it would be unjust to require a plaintiff to seek a remedy before he knows of his rights. *Id.* at 202–03. Such a requirement would force a patient to submit to physical examinations "by a series of independent physicians after every operation or treatment he received from the physician of his first choice. The unreasonableness of such a result is self-evident." *Id.* at 203.

In 1975—one year following *Baines*— the Iowa legislature amended statutory provisions dealing with medical malpractice. The new legislation was based on a finding "that a critical situation exists because of the high cost and impending unavailability of medical malpractice insurance." 1975 Iowa Acts ch. 239, § 1. Within the same chapter of the Iowa Acts, the legislature added a new subsection for the statute of limitations to specifically control medical malpractice cases. *Id.* § 26 (codified at Iowa Code § 614.1(9) (2001)). That provision provides in part:

Actions may be brought within the times herein limited, respectively, after their causes accrue, and not afterwards, except when otherwise specially declared:

. . . .

9. *Malpractice.*

. . . [T]hose founded on injuries to the person or wrongful death against any physician . . ., *arising out of patient care*, within two years after the date on which the claimant knew, or through the use of reasonable diligence should have known, or received notice in writing of the existence of, the *injury or death* for

which damages are sought in the action, whichever of the dates occurs first.... Iowa Code § 614.1(9) (emphasis added).

Shortly after the legislature passed section 614.1(9), this court had the opportunity to examine the legislature's purpose in enacting the provision. The court concluded legislative history clearly suggested that the legislature passed the provision in direct response to our *Baines* decision and to restrict the *Baines* discovery rule. *See Schultze v. Landmark Hotel Corp.*, 463 N.W.2d 47, 50 (Iowa 1990) (citing *Koppes v. Pearson*, 384 N.W.2d 381, 387 (Iowa 1986) (citing *Farnum v. G.D. Searle & Co.*, 339 N.W.2d 392, 395 (Iowa 1983)); *Kohrt v. Yetter*, 344 N.W.2d 245, 247 (Iowa 1984)).

With this background in mind, we turn to the question whether the discovery rule applies in this case. For reasons that follow, we conclude it does not.

**B. Analysis.** The critical language in section 614.1(9) is "injury or death for which damages are sought." Dr. Dawson contends as he did in the district court that the "injury" for purposes of section 614.1(9) was the removal of Schlote's voice box. Because the Schlotes filed their lawsuit more than two years after the surgery to remove Schlote's voice box, section 614.1(9) bars the suit under this interpretation of the statute.

The Schlotes counter as they did in the district court that the "injury" for purposes of section 614.1(9) was not the removal of the voice box. Rather, the injury was the excessive surgery resulting in the unnecessary removal of the voice box. The Schlotes were not aware of the unnecessary and excessive nature of the surgery until August 1998. This was less than two years before they filed suit.

The fighting issue boils down to the meaning of "injury" in the phrase "injury or death for which damages are sought" in section 614.1(9). The statute does not define "injury." So we look to its ordinary and common meaning. *State v. Webb*, 648 N.W.2d 72, 82 (Iowa 2002). There are several dictionary meanings for the word "injury." One meaning is "harm or damage that is done or sustained." *Webster's Encyclopedic Unabridged Dictionary* 983 (1996). This is the meaning Dr. Dawson gives to the word "injury" in section 614.1(9).

The dictionary also gives what it describes as a legal meaning: "any wrong or violation of the rights, property, reputation of another for which legal action to recover damages may be made." *Id.* This is the meaning the Schlotes implicitly give to the word "injury" in section 614.1(9). This is also the meaning the Restatement (Second) of Torts gives to the word "injury."

The Restatement describes "injury" as "the invasion of any legally protected interest of another." Restatement (Second) of Torts § 7(1), at 12 (1965). This meaning is also the meaning *Chrischilles* gave to the word "injury" in its definition of the discovery rule. *Chrischilles*, 260 Iowa at 463, 150 N.W.2d at 101 ("We conclude that plaintiff's cause of action did not accrue until he discovered or in the exercise of reasonable diligence should have discovered the *injury to his interest* ....") (emphasis added).

In contrast, the Restatement describes "physical harm" as "the physical impairment of the human body...." Restatement § 7(3). This is the meaning that Dr. Dawson gives to the word "injury" in section 614.1(9).

We think *Schultze* is strong support for Dr. Dawson's position. The question in *Schultze* was whether the statute of limitations under section 614.1(9) begins to run on discovery of the death or on discovery

of the wrongful act that caused the death. 463 N.W.2d at 48. Similar to the question here, the issue boiled down to the meaning of "death" in the following italicized language in section 614.1(9):

> ... [T]hose founded on injuries to the person or wrongful death against any physician ..., arising out of patient care, within two years after the date on which the claimant knew, or through the use of reasonable diligence should have known, or received notice in writing of the existence of, *the injury or death for which damages are sought in the action*....

Iowa Code § 614.1(9) (emphasis added).

The plaintiff argued that the words "injury" and "death" in the italicized language must be preceded by the modifiers "personal" and "wrongfully" so that the language reads: "within two years after the date on which the claimant knew ... of the [personal] injury or [wrongful] death...." *Schultze*, 463 N.W.2d at 48–49. The plaintiff argued that this construction was necessary "to effect the intent of the legislature thereby giving meaning to the discovery rule." *Id.* at 49. In *Schultze*, the plaintiff, like the Schlotes here, argued that the plaintiff should be able to use the discovery rule because the plaintiff was not immediately aware of the doctor's wrongful conduct that caused the death. *Id.*

We rejected the plaintiff's argument. We reasoned that "the common usage [of] the word 'death' refers to the end of life, a time certain." *Id.* We also said subsection 9 "standing alone is intelligible and the meaning is clear." *Id.* We therefore concluded that the statute of limitations on medical malpractice actions for wrongful death begins to run on the date of discovery of death, and not on date of discovery of the wrongful act that caused the death. *Id.* at 48.

We also said that subsection 9

provides its own modified discovery rule by commencing the two-year limitation period from "the date on which [plaintiff] knew, or through the use of reasonable diligence should have known, or received notice ... of, the ... death...." There is no suggestion or hint in this language that the legislature intended that we impose a different commencement date for the limitation period by imposing an additional condition that plaintiff knew the death was wrongful. To further extend the limitation period would be contrary to the plain language of the subsection and the legislature's intent to restrict the length of time for commencing malpractice actions. Additionally, it would create a discovery rule that supersedes a statutorily imposed discovery rule. This is contrary to the legislative intent.

*Id.* at 50.

Moreover, we rejected the plaintiff's arguments that "the discovery rule should apply to section 614.1(9) because of the 'extreme hardship' and 'strained and impractical result' it works on survivors." *Id.* at 51. We did so because such arguments were "based on judicial discretion used to implement notions of fairness rather than giving effect to the priorities that the legislature has set forth in an express statutory provision." *Id.*

■ Given the legislature's use of the conjunction "or" between the words "injury" and "death" in the above italicized language in section 614.1(9), the inescapable conclusion is that the legislature had in mind physical harm when using the word "injury" rather than the wrongful act that caused the injury. We say this because death is the ultimate injury. As *Schultze* points out, the legislature did not insert the modifier "personal" before inju-

ry; nor should we under the guise of judicial interpretation.

The legislative history we discussed and the policy considerations underlying section 614.1(9) support our conclusion. As mentioned, the legislature passed section 614.1(9) in direct response to *Baines* and to restrict the *Baines* discovery rule. Moreover, contrary to the conclusion we reach here, *Baines* refused to equate physical harm with imputed knowledge of its origin in malpractice. *Baines,* 223 N.W.2d at 201. In doing so, the court stated: "Knowledge of an injury may or may not be sufficient to alert a reasonably diligent person to the basis of his claim...." *Id.* Contrary to *Baines,* section 614.1(9) no longer requires that the plaintiff be aware of the defendant's wrongful conduct before the clock starts to run. *See Langner v. Simpson,* 533 N.W.2d 511, 517 (Iowa 1995) (section 614.1(9) begins to run even though the patient does not know the physician had *negligently* caused the injury). Nevertheless, the Schlotes would have us use the *Baines* discovery rule because the excessive and unnecessary surgery is not the *injury* but the *wrongful act.*

In *Luem v. Johnson,* the Georgia Court of Appeals interpreted a medical malpractice statute of limitations similar to Iowa Code section 614.1(9). 258 Ga.App. 530, 574 S.E.2d 835, 838 (2002). The Georgia statute provided that "an action for medical malpractice shall be brought within two years after the date on which an *injury or death* arising from a negligent or wrongful act or omission occurred." *Id.* (emphasis added). The court, reaching the same result as we have reached here, concluded:

> Georgia's current medical malpractice statute of limitation begins to run upon occurrence or discovery of the injury even where, as here, plaintiff's lack of awareness of the causal relationship between the injury and defendant's breach

of duty effectively precludes her from bringing suit at that time.

*Id.* at 839.

Here, as Dr. Dawson argues, the injury was the removal of the voice box on May 21, 1996. The statute of limitations began to run on that date because Schlote knew at the time that the surgery would result in removal of his voice box. The Schlotes did not file this lawsuit until February 17, 2000. This was more than two years after the surgery. Therefore the malpractice action is time-barred unless the fraudulent concealment doctrine applies.

We recognize that our interpretation of section 614.1(9) eliminates the discovery rule for medical malpractice claims as we have known it. Moreover, the facts here aptly demonstrate that the statute severely restricts the rights of unsuspecting patients who may be injured because of unnecessary and excessive surgery. However, it is up to the legislature and not this court to address this problem. As we have recognized,

> "[Statutes of limitation] are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay. They have come into the law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate...."

*Schulte v. Wageman,* 465 N.W.2d 285, 287 (Iowa 1991) (citation omitted).

Finally, the conclusion we reach requires us to overrule *Lawse v. University of Iowa Hospitals,* 434 N.W.2d 895, 898 (Iowa Ct.App.1988) (relying on *Baines,* the court of appeals concluded "injury" in section 614.1(9) means "discovery of one's cause of action for negligence").

That brings us to the fraudulent concealment issue.

## V. Fraudulent Concealment.

As mentioned, the doctrine of fraudulent concealment is the second exception to the general rule that the statute of limitations begins to run when the tort is committed. This court adopted the doctrine in *District Township of Boomer v. French*, 40 Iowa 601, 603–04 (1875). The doctrine as expressed in *District Township of Boomer* provides that

> where the party against whom a cause of action existed in favor of another, by fraud or actual fraudulent concealment prevented such other from obtaining knowledge thereof, the statute would only commence to run from the time the right of action was discovered, or might, by the use of diligence, have been discovered.

40 Iowa at 603. In *Koppes*, we held that the doctrine of fraudulent concealment survived adoption of section 614.1(9). *Koppes*, 384 N.W.2d at 387–88.

■ In applying the doctrine of fraudulent concealment, we have insisted several conditions must exist. To establish the doctrine, the plaintiff must show that (1) the defendant did some affirmative act to conceal the cause of action, and (2) the plaintiff exercised diligence to discover the cause of action. *Van Overbeke v. Youberg*, 540 N.W.2d 273, 276 (Iowa 1995). Given our interpretation of section 614.1(9), we now think the plaintiff in a medical malpractice case must show the defendant did some affirmative act to conceal the *injury* rather than the cause of action. However, the close relationship between patient and physician "gives rise to duties of disclosure which may obviate the need for a patient to prove an affirmative act of concealment." *Langner*, 533 N.W.2d at 522.

■ "Despite this 'special relationship,' which calls for a reduced level of proof of fraudulent concealment in certain cases, the acts of concealment must nevertheless be independent of the alleged acts relied on to establish liability." *Van Overbeke*, 540 N.W.2d at 276. To recognize fraudulent concealment without the independent requirement would "wipe out the statute of limitations" on medical malpractice claims. *Id.*

Finally, there must be a *"temporal* separation of the acts of negligence and the acts of alleged concealment; the concealment must take place after the alleged acts of negligence occurred." *Id.*

■ Here, the Schlotes contend that Dr. Dawson did not tell Schlote that the removal of his voice box was an unnecessary or excessive procedure and that another less radical surgery could have been performed. Dr. Dawson's failure to make those disclosures lies at the heart of the Schlotes' claims; such failure was not an independent, subsequent act of concealment. Failure to make those disclosures as a ground of liability cannot be the basis for fraudulent concealment. Otherwise "there would effectively be no statute of limitations for negligent failure to inform a patient." *Id.* at 277.

The Schlotes also contend that Dr. Dawson did not tell Schlote that he—Dr. Dawson—had a drug addiction when he performed surgery on Schlote. Apart from the fact that the record may not support such a contention, we think even if the contention were true, that fact does not establish a basis for fraudulent concealment. Dr. Dawson's failure to make such a disclosure is likewise a part of the Schlotes' claims and is not an independent subsequent act of concealment.

## VI. Disposition.

Contrary to the district court ruling, we conclude there is no genuine issue of material fact as to application of the discovery rule or as to the application of the fraudu-

lent concealment doctrine. We hold as a matter of law that neither exception to section 614.1(9) applies in this case. The district court erred in concluding otherwise. We therefore reverse and remand for an order sustaining Dr. Dawson's motion for summary judgment.

**REVERSED AND REMANDED WITH DIRECTIONS.**

All justices concur except CADY, J., who dissents and STREIT, J., who joins the dissent.

CADY, Justice (dissenting).

I respectfully dissent. The majority believes it is compelled to reach its result in this case because of the legislative amendment to the governing statute following our decision in *Baines*, 223 N.W.2d 199, and our post-amendment decision in *Schultze*, 463 N.W.2d 47. However, the legislative amendment and *Schultze* simply clarified that the statute of limitations for medical malpractice claims begins to run on the date the injury or death is discovered, not the date the wrongful act that caused the injury or death is discovered. *See Schultze*, 463 N.W.2d at 48–50. This legislative approach is based on the idea that knowledge of injury or death in the course of medical treatment should be enough to alert a person of the need to investigate the possibility of a cause of action based on negligence. This is a sound principle. Yet, this approach does not absolutely preclude the use of the date on which the plaintiff in this case discovered that his surgery was unnecessary as the date the statute of limitations began to run. While the statute establishes knowledge of injury, not knowledge of the wrongful act causing the injury, as the date the limitations period begins to run, it does not preclude using knowledge of the wrongful act as the basis for discovery of the injury in those cases where understanding the wrongfulness of the act is a necessary component to acquiring knowledge of the underlying injury.

There is a clear difference between using the discovery of the wrongful act as the date to commence the statute of limitations as precluded by the amendment and *Schultze* and using the wrongful act to discover the injury. Our failure to recognize this difference will only lead to unjust results, as it does in this case. By precluding a patient from using the discovery of the wrongful act as evidence of discovery of the injury, the majority has essentially written the concept of knowledge out of the discovery statute. Moreover, this opinion means every patient must now obtain a second—or third—opinion when surgery or another medical procedure is performed to protect against the statute of limitations running on some unknown injury. This, I submit, is an unnecessary judicial alteration to the statute and an unsound approach. We should not interpret statutes to provide absurd results, and construing this statute in a way that fosters overprotection of potential causes of action creates an absurd result. *See State v. Booth*, 670 N.W.2d 209, 211 (Iowa 2003).

In *Schultze*, the death that occurred from the medical treatment performed in the case was unintended, as any death from corrective medical treatment would be. *See Schultze*, 463 N.W.2d at 48. This unintended result, although not understood as resulting from negligence at the time, nevertheless commenced the statute of limitations because knowledge of death, unlike injury, is necessarily acquired by death itself. *See id.* at 50. Nothing more is needed. An injury, on the other hand, may or may not be known at the time it occurs. Of course, when the injury, as with death, is an unintended result of medical treatment, knowledge is acquired. Thus, although not necessarily understood

as involving negligence at the time, an unintended result from a surgery still constitutes an injury and commences the running of the statute of limitations. The unintended nature of the result, as with death, puts the patient on notice to at least investigate the possibility of an actionable claim. This case is clearly distinguishable.

In this case, the medical condition at issue was an intended result of the surgery. The removal of the voice box, as the intended result, cannot, by itself, be viewed by the patient to be an injury. More needs to be known. The plaintiff cannot be charged with knowledge that the condition is an injury without the later-acquired, additional information that the surgery was unnecessary. If the physical condition at issue—here, the removal of the voice box—was an injury at the time the medical procedure was performed, it was only because the procedure was unnecessary. Yet, the patient does not know he has been injured until such time as the patient discovers the procedure may have been unnecessary. The fact that this information also provides knowledge of a wrongful act does not take away its value as evidence of knowledge of injury.

A case such as this one is confusing because the plaintiff's discovery of the injurious nature of the surgery coincides with his discovery of his doctor's wrongful act. However, using the discovery of a wrongful act as the means of discovering an injury is consistent with our prior cases and the concept behind the discovery rule, and conforms to the intent and language of section 614.1(9). I would affirm the district court and remand for further proceedings.

STREIT, J., joins this dissent.