**Bruce L. RATCLIFF, Appellant,**

v.

**John M. GRAETHER and Wolfe Clinic, P.C., Appellees.**

**No. 03–1816.**

Supreme Court of Iowa.

May 13, 2005.

Rehearing Denied June 10, 2005.

John W. Holmes of Holmes & Holmes, Waterloo, for appellant.

Robert C. Rouwenhorst of Rouwenhorst & Brown, P.C., West Des Moines, for appellees.

LAVORATO, Chief Justice.

In this medical malpractice action, the plaintiff, Bruce L. Ratcliff, appeals from a district court ruling sustaining a motion for summary judgment filed by the defendants, John M. Graether, M.D. and Wolfe Clinic, P.C. At issue is whether the continuous treatment doctrine tolled the statute of limitations. Because we conclude the doctrine did not toll the statute, we affirm.

## I. Background Facts.

Wolfe Clinic, P.C. sponsored an orientation seminar, which Ratcliff attended, that provided information on elective surgery designed to reduce or eliminate the need to wear eyeglasses or contact lenses. At that seminar, Norman F. Woodlief, M.D. of the clinic talked about various surgical

techniques that were available, which involved removing tissue from the cornea.

On April 30, 1996, Ratcliff pursued this treatment at which time Graether of the Wolfe Clinic performed surgery on Ratcliff's right eye. That eye had a negative twelve diopters myopia reading prior to surgery.

On April 9, 1997, Graether performed an "enhancement" surgery on the eye. Enhancement surgeries remove additional tissue and further flatten the cornea. Such surgeries are often performed because surgeons choose to err on the side of undercorrection with the first surgery.

Ratcliff described how the enhancement surgery improved his vision:

[F]rom the moment it was uncovered the day following the surgery, the vision was clear and much improved over what I'd had prior to any surgery, and I felt that if I could get vision in my left eye as good as what I was now seeing in the right eye that this would be a benefit.

On April 30 Graether performed LASIK surgery on Ratcliff's left eye, which had a negative ten diopters myopia reading. After this surgery, Ratcliff said his vision was "very clouded" and "terrible" compared to what had happened just less than a month before on the right eye.

On May 13 Graether told Ratcliff he might have overcorrected the left eye. A week later, Graether told Ratcliff that a cataract was forming on that eye, which was not present prior to the surgery. The cataract formation, according to Graether, was just a coincidence.

At some point in 1997, Graether stopped seeing patients in the Wolfe Clinic's Cedar Falls office, where Graether had seen Ratcliff. Graether chose to see patients only in the clinic's Marshalltown office. From that time forward, Todd W. Gothard, M.D. treated Graether's Cedar Falls patients and kept Graether informed of their progress.

On December 23 Ratcliff saw Richard C. Mauer, M.D., an ophthalmologist and ophthalmic surgeon, because of the cataract formation. In his deposition, Ratcliff explained more fully why he saw Mauer and what Mauer told him:

I was still having a great deal of problem with my eye. I, frankly, had doubted their explanation of the cataract as being the cause, and so in the interim I had gone to Dr. Mauer for a second opinion as to the effect of the cataract. And I was told by Dr. Mauer that, yes, there was a very small, tiny cataract forming, but that it would not be perceptible to me at that stage, and he didn't believe that the cataract would account for my visual problems.

. . . .

Q. What did you tell Dr. Mauer? A. Well, to the best of my recollection, the general theme of it was that I had serious visual problems with the left eye and that both Dr. Graether and Dr. Gothard told me it was due to a cataract, and I didn't think the timing made much sense, and I wanted his opinion.

. . . .

Q. What did Dr. Mauer tell you he thought was wrong with your left eye when you saw him in December of 1997? A. He told me that he thought that the surface of my cornea was irregular. .

Q. And did he offer an opinion to you that that was probably related to the LASIK surgery that you had had on your left eye? A. I think he was careful not to accuse anybody of anything. But that was clearly the message that I got.

Q. All right. So he made it clear to you that—or at least the impression that you had when you left his office in December of 1997 was that the LASIK

procedure that you had had on April 30 of 1997 had caused some irregularity in your cornea; correct? A. Yes, that's correct.

. . . .

Q. So in the December visit of 1997 with Dr. Mauer, you believe that your problem was vision in your left eye related to an irregularity of your cornea; correct? A. That's correct.

. . . .

Q. But in December of 1997, you left Dr. Mauer's office with the impression that the April 30, 1997 LASIK procedure was the cause of your visual problems? A. Yes.

Mauer examined Ratcliff on several occasions from December 23, 1997 through February 14, 2002.

Ratcliff saw Gothard on November 18, 1998, and Gothard's medical notes of that visit state:

[Ratcliff] apparently had gotten a second opinion sometime since the last visit when I saw him, with Dr. Mauer who told him he had no effect or very little effect from the cataract and that it was mainly a problem with the LASIK surgery that was causing his vision to be blurry. . . .

. . . .

He is absolutely convinced that the LASIK surgery on the OS has made the cataract and also made his vision blurry. I have told him that there is absolutely no known association between LASIK and cataract formation. He was extremely confrontational and said that there is no way that we can know for sure that this did not cause the cataract, or cause his vision to be blurry. . . . [H]e really has his mind made up already regarding the cause of his problem. He is very reluctant to get glasses. He says the surgery was an entire waste,

and now he has poor vision. I've told him that he may have had a mild amount of myopic regression from the surgery, but I would be a little reluctant to perform any additional laser surgery at this juncture due to the fact that there is a cataract forming and the refraction has been changing.

On November 20, 1998, Graether wrote Ratcliff telling him that the cataract was "merely coincidence" and had nothing to do with the surgery to the eye. Graether also wrote that because of the developing cataract no further refractive surgery should be done to improve Ratcliff's vision. "[A]ny improvement," wrote Graether, "would only be transient."

In a letter dated February 22, 2002, Mauer opined that Ratcliff's poor vision was due to an irregular astigmatism. He attributed the condition to several factors, including the surgical procedures employed to treat Ratcliff's left eye.

## II. Proceedings.

On November 16, 2000, Ratcliff sued Graether and Wolfe Clinic. Ratcliff alleged that the defendants combined different procedures in a two-step process in their attempt to correct the myopia of negative ten diopters in his left eye. He further alleged that such process had not been studied or approved by the FDA. Ratcliff also alleged that he would not have consented to such a procedure if he had known these facts, and the defendants suppressed the information to get him to consent.

The defendants asserted a number of affirmative defenses, one of which is the subject of this appeal: Ratcliff's claims are barred by the two-year statute of limitations found in Iowa Code section 614.1(9).

Later, the defendants filed a motion for summary judgment, asserting that the ac-

tion was time-barred by section 614.1(9). Ratcliff resisted, contending that the continuous treatment doctrine tolled the statute of limitations. The district court denied the motion, ruling that genuine issues of material fact existed. The ruling discussed the possible application of the continuous treatment doctrine.

Following the district court's ruling, the defendants filed their second motion for summary judgment. In it the defendants asked the court to assume, for the purposes of the motion only, that the continuous treatment doctrine would be adopted and would be applied in this case. Even assuming adoption of the continuous treatment doctrine, the defendants contended the single act exception applied to the case and the action was therefore barred by the statute of limitations.

The district court granted the motion and dismissed the case. The district court noted that Ratcliff saw Mauer in December 1997 and left his office with the impression that the April 30, 1997 LASIK procedure was the cause of his visual problems. Under these circumstances, the district court reasoned, it was inappropriate to apply the continuous treatment doctrine after December 1997. The court concluded that because the statute of limitations expired in 1999 and Ratcliff did not file his petition until November 2000, the action was barred.

Ratcliff filed a motion to enlarge or amend findings pursuant to Iowa Rule of Civil Procedure 1.904(2). In its ruling on this motion, the district court concluded that the single act exception applied because Ratcliff was on immediate notice of his injury when, following the surgery, his left eye vision was impaired. The court reasoned that, under the single act exception, if there is a single act of malpractice, subsequent time and effort to remedy or cure the act does not toll the statute of

limitations. Additionally, the court ruled, even if the continuous treatment doctrine were to be applied in this case, it could not be applied later than the December 1997 consultation with Mauer.

Following this latter ruling, Ratcliff appealed.

### III. Issues.

On appeal, Ratcliff raises three issues, only one of which we need to address: whether the continuous treatment doctrine applies to toll the statute of limitations.

### IV. Scope of Review.

[1, 2] We recently summarized rules governing motions for summary judgment in *Berte v. Bode:*

"Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. There is no fact issue if the only dispute concerns the legal consequences flowing from the undisputed facts. Our review is therefore limited to whether a genuine issue of material fact exists and whether the district court correctly applied the law."

692 N.W.2d 368, 370 (Iowa 2005) (citation omitted).

### V. Analysis.

The statute of limitations for medical malpractice claims provides in relevant part:

Actions may be brought within the times herein limited, respectively, after their causes accrue, and not afterwards, except when otherwise specifically declared:

. . . .

9. *Malpractice.*

*a.* Except as provided in paragraph "*b*", those founded on injuries to the person ... against any physician and surgeon ... arising out of patient care, *within two years after the date on which the claimant knew, or through the use of reasonable diligence should have known ... of the existence of, the injury ... for which damages are sought* in the action, whichever of the dates occurs first....

Iowa Code § 614.1(9)(*a*) (2003) (emphasis added).

■ The italicized language is the legislature's discovery rule and means the statute of limitations "begins to run when the patient knew, or through the use of reasonable diligence should have known, of the injury for which damages are sought." *Langner v. Simpson,* 533 N.W.2d 511, 517 (Iowa 1995). "Injury" for the purposes of this discovery rule means physical harm rather than the wrongful act that caused the injury. *Schlote v. Dawson,* 676 N.W.2d 187, 193 (Iowa 2004), *disavowed on other grounds by Christy v. Miulli,* 692 N.W.2d 694, 701 n. 1 (Iowa 2005). In *Schlote,* we held the removal of plaintiff's voice box was the injury and not the alleged unnecessary and excessive treatment in removing it. *Id.* at 194. Because the plaintiff knew that the surgery would result in removal of his voice box, we held the statute of limitations began to run on the date of the surgery. This was more than two years before the plaintiff filed suit, resulting in the action being time-barred. *Id.*

■ Underlying the discovery rule is inquiry notice. We explained inquiry notice in *Langner:*

[T]he statute [of limitations] begins to run when a person gains knowledge sufficient to put the person on inquiry. On that date, the person is charged with knowledge of facts that would have been disclosed by a reasonably diligent inves-

tigation. Moreover, once a person is aware that a problem exists, the person has a duty to investigate even though the person may not have knowledge of the nature of the problem that caused the injury.

533 N.W.2d at 518.

■ Here, by Ratcliff's own admission, he was aware of an eye problem on May 1, 1997, the day following surgery on his left eye. He was on inquiry notice at that point which charged him with knowledge of facts that would have been disclosed by a reasonably diligent investigation. And by his own admission, he *knew* on May 13, 1997 that there might have been an over-correction when Graether told him so. Finally, by his own admission, when he left Mauer's office in December 1997, he *knew* that Mauer believed the April 30, 1997 procedure was the cause of his visual problems in his left eye. Graether's and Mauer's comments amounted to actual notice on the part of Ratcliff of his left eye injury. Ratcliff did not file suit until November 16, 2000, more than two years later. His action was therefore time-barred, unless, as he urges, we adopt the continuous treatment doctrine to toll the statute of limitations. Although we have been urged to adopt the doctrine in two cases, *see McClendon v. Beck,* 569 N.W.2d 382, 385 (Iowa 1997) and *Langner,* 533 N.W.2d at 519, we have yet to adopt it.

■ The so-called "continuous treatment" doctrine as generally formulated at common law provides that

if the treatment by the doctor is a continuing course and the patient's disease or condition is of such a nature as to impose on the doctor a duty of continuing treatment and care, the statute does not commence running until treatment by the [doctor] for the particular disease or condition involved has terminated, *unless during the course of treatment the patient learns or should reasonably*

*have learned of the harm, in which case the statute runs from the time of knowledge, actual or constructive.*

*Waldman v. Rohrbaugh,* 241 Md. 137, 215 A.2d 825, 827–28 (1966) (emphasis added). The doctrine was adopted as a "judicial effort to soften the harshness of the statutory accrual rule existing in the particular jurisdiction at the time." *Ewing v. Beck,* 520 A.2d 653, 660 (Del.1987). The statutory accrual rule provided that the cause of action accrues and the statute of limitations begins to run from the time of the negligent act. *Waldman,* 215 A.2d at 827. Consequently, in many cases, the victim was not aware of the initial wrong until after the limitations period had run. *Id.*

The defendants contend, as they did in the district court, that the doctrine does not apply here. For reasons that follow, we agree.

As one court explained concerning a medical malpractice statute of limitations:

> Considering the formulation of the doctrine, and the rationale upon which it is based, it is clear that the continuing medical treatment doctrine is merely a particularized application of the discovery rule. The rule presumes, for policy reasons, that a patient has not discovered an injury during the time medical treatment continues. If there is actual proof that the patient *knows or reasonably should know of the injury or harm before termination of medical treatment,* the statute of limitations is not tolled. The rule has outlived its necessity in light of the comprehensive medical malpractice statute of limitations which requires that suit be brought within one year of the negligent act or within one year of discovery.

*Stanbury v. Bacardi,* 953 S.W.2d 671, 676 (Tenn.1997).

The court in *Stanbury* noted that it had adopted the discovery rule for determining when the statute of limitations begins to run in medical malpractice actions in *Teeters v. Currey,* 518 S.W.2d 512 (Tenn.1974) but had not addressed the relationship between the newly adopted discovery rule and the continuous medical treatment doctrine. *Id.* at 675. Six months later, the Tennessee legislature included the discovery rule as part of its Medical Malpractice Claims Act of 1975. *Id.* at 675–76. In view of the court's adoption of the discovery rule in *Teeters* and inclusion of the discovery rule in this statute, the court in *Stanbury* held that "the common law continuing medical treatment doctrine has been abrogated by judicial and legislative adoption of the discovery rule in this State." *Id.* at 676. The court noted that "[a]lthough the common law doctrine still is recognized in some jurisdictions, it has been judicially or legislatively abrogated in many states following adoption of the discovery rule." *Id.* at 676–77 (footnote omitted) (citing jurisdictions).

█ We need not decide whether we should reject the continuous treatment doctrine outright in all circumstances. However, we do think the doctrine does not apply when the plaintiff, as here, is on inquiry notice, a concept that underlies the discovery rule that is now part of Iowa Code section 614.1(9)(*a*).

## VI. Disposition.

Because Ratcliff has generated no genuine issue of material fact regarding the tolling of the statute of limitations, we conclude the district court correctly granted the defendants' motion for summary judgment. Finding no error, we affirm.

**AFFIRMED.**

All justices concur except CARTER, J., who takes no part.