# IN THE SUPREME COURT OF IOWA

No. 06–0641

Filed December 5, 2008

**MARTI WILKINS, as Executor of the Estate of JERALD C. WILKINS,**

Appellant,

vs.

**MARSHALLTOWN MEDICAL AND SURGICAL CENTER, ERIC J. STENBERG, D.O., DAVID L. THOMAS, M.D., LANCE M. VAN GUNDY, M.D.,** and **MCFARLAND CLINIC, P.C.,**

Appellees.

---

Appeal from the Iowa District Court for Marshall County, Dale E. Ruigh, Judge.

Plaintiff appeals the district court's grant of summary judgment in a medical malpractice action. **REVERSED AND REMANDED.**

Erik A. Luthens of Luthens Law Offices, P.C., West Des Moines, for appellant.

Hayward L. Draper and John T. Clendenin of Nyemaster, Goode, West, Hansell & O'Brien, P.C., Des Moines, for appellee Marshalltown Medical and Surgical Center.

Steven K. Scharnberg and Thomas J. Joensen of Finley, Alt, Smith, Scharnberg, Craig, Hilmes & Gaffney, P.C., Des Moines, for appellees Stenberg, Thomas, Van Gundy, and McFarland Clinic.

**APPEL**, **Justice**.

This case presents a question regarding the proper application of the statute of limitations in a medical malpractice action where the plaintiff's claim is based on an alleged failure to timely diagnose prostate cancer. The district court granted the defendants' motion for summary judgment, concluding the claim was filed after the expiration of the applicable statute of limitations. In light of recent decisions, we reverse and remand this case for further proceedings.

## I. Factual and Procedural Background.

Jerald Wilkins was a roving utility pole inspector who resided at a motel in Marshalltown, Iowa. He did not have health insurance and did not have a regular, primary care physician after 1982. Like many uninsured persons, Wilkins occasionally sought medical treatment at the emergency room of a local hospital.

On September 23, 2001, Wilkins appeared at the Marshalltown Medical and Surgical Center (MMSC) emergency room complaining of vague abdominal pain, blood in his urine, and expectoration of blood from his respiratory tract. Dr. Lance Van Gundy examined Wilkins and ordered a chest x-ray. Van Gundy determined that the x-ray showed no change from a prior x-ray taken one month earlier. Van Gundy's impression was that Wilkins suffered from a number of difficulties, including inflammation of the kidneys, presence of protein in his urine, expectoration of blood from the respiratory tract, urinary tract infection, elevated liver function, abdominal pain consistent with gastritis induced by heavy alcohol consumption, and tobacco abuse. Van Gundy's plan included urgent follow up at the University of Iowa Hospitals and Clinics (UIHC). Wilkins was discharged from the emergency room later that same day.

The next day, September 24, Dr. Kraig Kirkpatrick, a radiologist, reviewed Wilkins's chest x-ray. Kirkpatrick compared an x-ray of Wilkins's chest taken more than five years earlier in May 1996 with his current image. In doing so, Kirkpatrick observed a "diffuse increase in the density of a midthoracic vertebral body." Kirkpatrick noted that diagnostic possibilities for this change included, but were not limited to "Paget's disease, lymphoma and sclerotic metastasis." According to Kirkpatrick, the most common source of sclerotic metastasis in Wilkins's age group would be prostate cancer. Kirkpatrick's x-ray report was approved by Dr. Mitchell Erickson and made part of Wilkins's file.

Also on September 24, Wilkins returned to the MMSC emergency room. He now complained of "increasing upper abdominal pain." Wilkins was seen by Dr. Eric Stenberg. Stenberg ordered a computed tomography (CT) scan of Wilkins's chest, abdomen, and pelvis. Dr. Erickson, the same physician who approved Kirkpatrick's report indicating Wilkins may be suffering from prostate cancer, read the CT scan. Erickson noted that there are "no comparison studies" and made no reference to Kirkpatrick's report.

Wilkins was transferred to UIHC that same day for follow-up studies. While eighteen pages of medical records were forwarded to UIHC, the Kirkpatrick report indicating that Wilkins may have prostate cancer was not included. Wilkins was subsequently discharged from UIHC two days later "without any symptomatic complaints." In a letter dated October 10, Dr. Lisa Antes informed Van Gundy that Wilkins's condition had improved at UIHC and that his pain had "completely resolved" by the end of his stay. Her diagnosis was alcohol-induced gastritis.

After his discharge from UIHC, Wilkins next presented himself to the MMSC emergency room on February 27, 2002. At that time, Wilkins complained of "difficulty with urination, frequency, urgency and burning as well as some chills and a headache over the course of the past three or four days." MMSC's records indicate Wilkins experienced pain in his "bladder area." The diagnosis by physician's assistant, Larry Conley, and his supervisor, Stenberg, was "[u]rinary tract infection by history and physical." They prescribed an antibiotic for the infection. They also advised Wilkins to increase his fluids and follow up with the provider of his choice should there be no improvement over the next forty-eight hours. Wilkins did not follow up with a provider, however, stating that his condition did seem to improve over the next couple of days.

Wilkins returned again to the MMSC emergency room on March 25, June 19, July 6, July 7, and August 9. On these occasions, he was seen by Stenberg, Van Gundy, and Dr. David Thomas. His complaints included low back pain, neck pain, and difficulty urinating. The physicians assessed Wilkins as having low back, cervical, or lumbar strain and provided him with prescriptions for pain relief and muscle relaxation. On August 9, MMSC medical records show that Wilkins was advised that he would not receive further injections of pain relief medicine or samples "because he had failed to follow up" with other medical providers. Van Gundy recommended that Wilkins "follow up" with the Primary Health Clinic in the immediate future to seek a potential pain clinic referral to UIHC.

On August 14, Wilkins was brought to the MMSC emergency room via ambulance. Wilkins could not feel or move his legs. MMSC's records indicate suspicion of prostate cancer with metastases to the lumbar spine and secondary paralysis. On that same day, Wilkins is, for the

first time, informed of the possibility of prostate cancer. The physicians recommend transfer to UIHC for a higher level of care.

On February 27, 2004, Wilkins filed a petition against MMSC, Stenberg, Thomas, and Van Gundy alleging negligent medical care from February 27, 2002 onward. Thereafter, plaintiff successfully moved to amend the petition to name McFarland Clinic, P.C. as a co-defendant. The petition was later amended to substitute Wilkins's wife as executor of Wilkins's estate upon his death.

All defendants denied liability and moved for summary judgment. Each asserted that Wilkins's claims were barred by the relevant statute of limitations. MMSC additionally asserted that it had no legal responsibility for the actions of the emergency room physicians as they were employees of McFarland and not the hospital.

The district court granted summary judgment to the defendants on statute-of-limitations grounds. The district court determined that the relevant inquiry was whether Wilkins knew or should have known of his injury, which the court defined as the worsening physical symptoms of prostate cancer, more than two years prior to the filing of the lawsuit on February 27, 2004. The court determined that Wilkins "knew or should have known" of his worsening cancer symptoms prior to February 27, 2002—more than two years before the commencement of this action.

In granting summary judgment on the medical negligence claim, the district court emphasized that the allegations in the petition and the opinions offered by plaintiff's expert witnesses did not draw distinctions among the actions of the individual physicians, but rather asserted that they were *collectively* negligent in failing to timely diagnose Wilkins's prostate cancer. Thus it was immaterial that some of the *individual* acts

of negligence were not barred by the statute of limitations.[1]  In reaching its decision, the district court further rejected the plaintiff's claim for fraudulent concealment and applicability of the continuous treatment doctrine.

## II. Standard of Review.

We review a district court's ruling on a motion for summary judgment for correction of errors at law.  *Schlote v. Dawson,* 676 N.W.2d 187, 188 (Iowa 2004).  Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law."  Iowa R. Civ. P. 1.981(3); *accord Ratcliff v. Graether,* 697 N.W.2d 119, 123 (Iowa 2005).  A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Baratta v. Polk Co. Health Serv.,* 588 N.W.2d 107, 109 (Iowa 1999).

## III. Discussion.

**A. Statute of Limitations.**  The outcome of this case is controlled by our decision in *Rock v. Warhank,* 757 N.W.2d 670 (Iowa 2008).  In *Rock*, we held that in a medical misdiagnosis case involving cancer, the earliest possible triggering date for the statute of limitations under Iowa Code section 614.1(9) is when the patient is properly diagnosed with

---

[1]Due to the disposition of this case, we do not reach the question of collective versus individual acts of negligence or whether a second misdiagnosis by the same doctor or the same medical team constitutes a separate actionable injury or is merely a continuation of the first.  We do note, however, that jurisdictions have split on this latter question.  *Compare King v. Sullivan,* 961 S.W.2d 287, 292 (Tex. Ct. App. 1997) (holding that second misdiagnosis constituted a separate tort where the statute of limitations was triggered by the occurrence of the malfeasance), *with Kaminer v. Canas,* 653 S.E.2d 691, 695 (Ga. 2007) (holding that while the second misdiagnosis may constitute a separate act of professional negligence it does not "restart" statute of limitations because no new injury has occurred).

cancer. *Rock*, 757 N.W.2d at 675. In this case, Wilkins was not informed that he had cancer until sometime after August 14, 2002. That date is well within two years of the commencement of the present action. Wilkins's claim is thus not barred as a matter of law by the governing statute of limitations.[2]

The defendants also assert that Wilkins's claim is barred as a matter of law by the statute of limitations due to his failure to seek follow-up care. They rely in part upon a form that Wilkins signed after his emergency room visits which declared, among other things, that the patient was examined and treated "on an emergency basis only" and that "[i]n most cases you must let your doctor check you again."

We hold that Wilkins's alleged failure to follow-up with other physicians after his emergency room visits does not provide a basis for summary judgment on statute-of-limitations grounds. Nothing in the paperwork or instructions cited by the defendants puts Wilkins on notice of either his injury or its cause. The defendants' argument is not really based upon the statute of limitations, but instead involves issues related to the scope of its duty to Wilkins and issues of comparative fault. The statute of limitations does not form a basis for summary judgment for these types of arguments.

**B. Vicarious Liability.** MMSC also asserts that it is entitled to summary judgment because Wilkins has failed to generate a genuine issue of material fact as to whether it is legally liable for the actions of the McFarland doctors who staffed the MMSC emergency room. The undisputed record shows that the individual physicians were not employees of the hospital. Instead McFarland contracted with MMSC to

---

[2]Our resolution of this issue in favor of Wilkins makes it unnecessary to address his claims that the district court erred in failing to adopt the continuous treatment doctrine and in rejecting his assertion of fraudulent concealment.

staff and direct the operations of the hospital's emergency room. Nevertheless, Wilkins contends and the district court agreed that MMSC is vicariously liable for any negligence through the doctrine of "ostensible" agency, otherwise known as apparent authority.[3]

> Liability based on ostensible agency has been defined as:
>
> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

Restatement (Second) of Agency § 267 (1958). The existence of an ostensible agency thus is determined by the principal's actions, rather than the acts of the agent. *Waukon Auto Supply v. Farmers & Merchants Sav. Bank*, 440 N.W.2d 844, 847 (Iowa 1989). This determination is a question of fact. *Id.*

MMSC argues, however, that as a matter of law no ostensible agency could have been created because (1) the emergency room doctors were independent contractors, and (2) MMSC never represented the emergency room doctors to be MMSC employees.

First, in an ostensible agency the actual status of the agent is immaterial.

> One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.

---

[3]Although not presented in this appeal, other jurisdictions are split as to whether a hospital can ever delegate its duty of care for its emergency room physicians. *Compare Simmons v. Tuomey Reg'l Med. Ctr.*, 533 S.E.2d 312, 322 (S.C. 2000) (finding a nondelegable, but not absolute, duty), *with Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 948 (Tex. 1998) (rejecting imposition of a nondelegable duty).

Restatement (Second) of Torts § 429 (1965). Thus, the mere fact that the emergency room doctors were not MMSC employees is not dispositive.

Second, although the record does not demonstrate that MMSC ever expressly held out the emergency room doctors as employees, Wilkins has put forth circumstantial evidence from which an agency relationship can be inferred. For instance, MMSC held itself out to the public as maintaining a 24-hour emergency room. Such advertizing corresponds with our previous observation " 'that an emergency-room patient looks to the hospital for care, and not to the individual physician—the patient goes to the emergency room for services, and accepts those services from whichever physician is assigned his or her case.' " *Wolbers v. The Finley Hosp.,* 673 N.W.2d 728, 734 (Iowa 2003) (quoting 40A Am. Jur. 2d *Hospital & Asylums* § 48, at 460 (1999)); *see also Mehlman v. Powell,* 378 A.2d 1121, 1124 (Md. 1977) (stating "all appearances suggest and all ordinary expectations would be that the Hospital emergency room, physically a part of the Hospital, was in fact an integral part of the institution"); *Arthur v. St. Peters Hosp.,* 405 A.2d 443, 447 (N.J. Super. Ct. 1979) (noting that absent a situation where the patient is directed by his own physician or where the patient makes an independent selection as to which physicians he will use, it is the reputation of the hospital itself upon which the patient relies). *But see Latham v. Ohio State Univ. Hosp.,* 594 N.E.2d 1077, 1080 (Ohio Ct. App. 1991) ("The existence of a hospital alone does not constitute an inducement that all physicians therein are acting under the hospital's direction and control.").

MMSC did not take any affirmative steps to combat the natural assumption that the emergency room doctors were hospital employees. Additionally, patients were billed for emergency room services by MMSC and not by the McFarland Clinic. Under the facts of this case, a

reasonable jury could, therefore, find that MMSC is vicariously liable for the negligence of the emergency room doctors on a theory of apparent authority or ostensible agency. As a result, MMSC is not entitled to summary judgment on the ground that it cannot be held vicariously liable for the acts of the defendant physicians.

**IV. Conclusion.**

Because we hold that this case was not properly resolved by summary judgment, we reverse and remand the case for further proceedings.

**REVERSED AND REMANDED.**

All justices concur except Baker, J., who takes no part.